[892 NYS2d 8]

In the Matter of PARMINDER KAUR et al., Petitioners, v NEW YORK STATE URBAN DEVELOPMENT CORPORATION, Doing Business as EMPIRE STATE DEVELOPMENT CORPORATION, Respondent. In the Matter of TUCK-IT-AWAY, INC., et al., Petitioners, v NEW YORK STATE URBAN DEVELOPMENT CORPORATION, Doing Business as EMPIRE STATE DEVELOPMENT CORPORATION, Respondent.

First Department, December 3, 2009

### APPEARANCES OF COUNSEL

*Goldberg Weprin Finkel Goldstein LLP*, New York City (*David L. Smith* of counsel), for Parminder Kaur and others, petitioners.

*Norman Siegel*, New York City, *McLaughin & Stern, LLP*, New York City (*Steven J. Hyman* of counsel), and *Philip Van Buren*, New York City, for Tuck-It-Away petitioners.

*Carter Ledyard & Milburn LLP*, New York City (*John R. Casolaro, Joseph M. Ryan, Susan B. Kalib, Victor J. Gallo* and *Theodore Y. McDonough* of counsel), and *Sive Paget & Riesel, P.C.*, New York City (*Mark Chertok* and *Dan Chorost* of counsel), for respondent.

### OPINION OF THE COURT

Catterson, J.

> " 'An ACT of the Legislature (for I cannot call it a law) contrary to the great first principles of the

social compact, cannot be considered a rightful exercise of legislative authority . . . A few instances will suffice to explain what I mean . . . [A] law that takes property from A. and gives it to B: It is against all reason and justice, for a people to entrust a Legislature with SUCH powers; and, therefore, it cannot be presumed that they have done it. The genius, the nature, and the spirit, of our State Governments, amount to a prohibition of such acts of legislation; and the general principles of law and reason forbid them." (*Calder v Bull*, 3 Dall [3 US] 386, 388 [1798].)[1]

The exercise of eminent domain power by the New York State Urban Development Corporation, doing business as Empire State Development Corporation (hereinafter referred to as ESDC) to benefit a private elite education institution is violative of the Takings Clause of the US Constitution, article I, § 7 of the New York Constitution, and the "first principles of the social compact." The process employed by ESDC predetermined the unconstitutional outcome, was bereft of facts which established that the neighborhood in question was blighted, and ultimately precluded the petitioners from presenting a full record before either ESDC or, ultimately, this Court. In short, it is a skein worth unraveling.

## THE TAKING OF MANHATTANVILLE

This case involves the acquisition, by condemnation or voluntary transfer, of approximately 17 acres in the Manhattanville area of West Harlem for the development of a new campus for Columbia University, a not-for-profit corporation (hereinafter referred to as the Project). The Project, referred to as the Columbia University Educational Mixed Use Development Land Use Improvement and Civic Project, would consist of a total of approximately 6.8 million gross square feet in up to 16 new buildings, a multi-level below-grade support space, and the adaptive reuse of an existing building. In addition, the Project would purportedly create approximately two acres of publicly accessible open space, a market along 12th Avenue, and widened, tree-lined sidewalks.

---

1. The beginning of Justice O'Connor's dissent in *Kelo v New London* (545 US 469, 494 [2005]) quotes extensively from this passage. However, one need not adopt her dissenting position to agree with the powerful warning of Justice Chase in *Calder*.

The Project site is bounded by and includes West 125th Street on the south, West 133rd Street on the north, Broadway and Old Broadway on the east, and 12th Avenue on the west, as well as certain areas located beneath city streets within this area and beneath other city streets in the Project site. The estimated acquisition and construction cost for the Project is $6.28 billion, and will be funded by Columbia without any contribution from any municipal entity.

In 2001, Columbia, together with numerous other organizations, began working with the New York City Economic Development Corporation (hereinafter referred to as EDC) to redevelop the West Harlem area. In August 2002, the EDC issued a West Harlem Master Plan (hereinafter referred to as the Plan) describing the economic redevelopment plan. In the Plan, the EDC contended that the area was "once denser, livelier and a waterside gateway for Manhattan," and that "[a] renewed future seem[ed] possible." The EDC stated that it hoped to "revitaliz[e] . . . a long-forsaken waterfront," provide transportation, develop "a vibrant commercial and cultural district," and support academic research. The EDC noted that the current land use was "auto-related or vacant," with several "handsome, mid-rise buildings . . . interspersed with parking lots and partially empty industrial buildings." According to data prepared for the Plan by Ernst & Young, 54 of the 67 lots were in "good," "very good" or "fair" condition.

In 2000, Columbia owned only two properties in the Project area. In 2002, Columbia began purchasing property in the area in order to effectuate its own plan to expand its facilities. By early October 2003, Columbia controlled 51% of the property in the Project area—33% of which was still privately owned.

As early as March 2004, ESDC, EDC, and Columbia began meeting regarding the Project and the condemnation of land. In June 2004, Columbia hired Allee King Rosen & Fleming, Inc. (hereinafter referred to as AKRF), an environmental and planning consulting firm, to assist in its planning, to act as its agent in seeking approvals and determinations from various agencies necessary to realize its expansion plan, and to prepare an environmental impact statement (hereinafter referred to as the EIS). (*See Matter of Tuck-It-Away Assoc., L.P. v Empire State Dev. Corp.*, 54 AD3d 154, 157 [1st Dept 2008], *lv granted* 12 NY3d 708 [2009] [hereinafter referred as *Tuck-It-Away I*].) AKRF began attending meetings with Columbia, ESDC and EDC in connection with the Project.

On July 30, 2004, Columbia entered into an agreement with ESDC to pay the costs incurred by ESDC in connection with the Project. According to the agreement, Columbia owned or controlled, or expected to control, "a substantial portion of the lots within the" Project area.

In August 2004, EDC issued a "Blight Study" of the West Harlem/Manhattanville Area which was prepared by a consultant, Urbitran Associates, Inc. The study concluded that the area was "blighted."

In December 2004, ESDC, not content to rest on the Urbitran study, noted that it would have to make its own "blight findings" in connection with the Project. In an e-mail dated January 7, 2005, Columbia's project manager, Lorinda Karoff of Karen Buckus and Associates, indicated that Columbia's attorneys "and also possibly AKRF (who has already reviewed the document once at EDC's offices), wished to see the draft blight study." Karoff noted that the draft study "may change or even be completely replaced as ESDC uses different standards than the City."

In or about September 2006, ESDC retained Columbia's consultant AKRF to evaluate the conditions at the Project site. AKRF in turn retained Thornton Tomasetti, Inc., an engineering firm, to inspect and evaluate the physical condition of each existing structure at the Project site.

On November 1, 2007, AKRF issued its Manhattanville Neighborhood Conditions Study (hereinafter referred to as AKRF's study). The study noted that as of April 30, 2007, Columbia owned or had contracted to purchase 48 of the 67 tax lots (72%) in the study area. The study found that "48 of the 67 lots in the study area (or 72 percent of the total lots) have one or more substandard condition, including poor or critical physical lot conditions, a vacancy rate of 25 percent or more, or site utilization of 60 percent or less." In addition, the study found that "34 of the 67 lots in the study area (or 51 percent of the total lots) were assessed as being in poor or critical condition." According to the study, "[t]he presence of such a high proportion of properties with multiple substandard conditions suggests that the study area has been suffering from a long-term trend of poor maintenance and disinvestment." The study concluded that the Project area was "substantially unsafe, unsanitary, substandard, and deteriorated."

On November 16, 2007, the New York City Planning Commission (hereinafter referred to as the CPC), the lead agency for

the Project under the New York State Environmental Quality Review Act (hereinafter referred to as SEQRA) and the City Environmental Quality Review Act (hereinafter referred to as CEQRA), issued a notice of completion for the Project's final environmental impact statement (hereinafter referred to as the FEIS). On November 26, 2007, CPC issued its findings on the FEIS pursuant to both SEQRA and CEQRA.

After a public hearing held by the City Council on December 12, 2007, the Council approved the rezoning of approximately 35 acres of West Harlem including the 17-acre Project site. Meanwhile, West Harlem Business Group (hereinafter referred to as WHBG), a group of businesses within the Project area, as well as Tuck-It-Away Associates, L.P. (TIA), a member of WHBG, requested various documents from ESDC related to the Project pursuant to the Freedom of Information Law (hereinafter referred to as FOIL). When ESDC refused to provide certain documents, WHBG and TIA filed CPLR article 78 petitions. (*See Tuck-It-Away I*, 54 AD3d at 159.)

On July 3, 2007 and on or about August 23, 2007, the New York County Supreme Court (Shirley Werner Kornreich, J.) granted the applications to compel ESDC to release the documents, including documents involving ESDC's communications with AKRF. In particular, the court found that an agency exemption did not apply to the AKRF documents since AKRF lacked "sufficient neutrality" due to its role as a consultant for both ESDC and Columbia. ESDC appealed from those orders.

On July 15, 2008, this Court affirmed Supreme Court's order for disclosure of documents related to ESDC's communications with AKRF, and otherwise reversed. (*See Tuck-It-Away I*, 54 AD3d at 162.) With respect to the AKRF documents, we agreed with Supreme Court that AKRF's representation of both ESDC and Columbia with respect to the Project "creates an inseparable conflict for purposes of FOIL." (54 AD3d at 164.) In particular, we found that "FOIL is not blind to the extensive record of the tangled relationships of Columbia, ESDC and their shared consultant, AKRF." (54 AD3d at 166.) Due to AKRF's consulting and advocacy work for Columbia, we questioned AKRF's ability to provide "objective advice" to ESDC, particularly with respect to its preparation of the blight study. (*Id.*)

In response to the concerns about AKRF's neutrality, on February 7, 2008, approximately two months after we heard oral argument on the FOIL litigation, Carter Ledyard & Milburn LLP, acting on behalf of ESDC, retained Earth Tech, Inc., an

engineering and environmental consultant, to "audit, examine and evaluate" AKRF's study. Pursuant to that agreement, Earth Tech was "not now providing services to" Columbia and was prohibited from "perform[ing] any services for Columbia throughout the duration of th[e] Agreement." While the agreement is not an admission that AKRF was thoroughly compromised in its representation of both ESDC and Columbia, it is nonetheless an acutely transparent attempt to inoculate Earth Tech and ESDC from the damage done by AKRF.

In May 2008, almost six years after EDC issued the West Harlem Master Plan, and five years after Columbia gained control of more than one half of the realty contained in the Project area, Earth Tech issued a Manhattanville Neighborhood Conditions Study. According to that study, Earth Tech "independently reviewed" AKRF's study as well as Thornton Tomasetti's findings relating to the structural conditions of the buildings in the Project site. As part of its review, Earth Tech inspected and assessed the 67 lots on the Project site, "surveyed the study area," and "conducted various searches of public data bases on environmental contamination, Building Code violations, and ownership records." It bears repeating that, by this time, Columbia either owned or was in contract to purchase 48 of those 67 lots.

According to the Earth Tech study, Earth Tech's "independently arrived at findings substantially confirm[ed] those of AKRF and Thornton Tomasetti." However, Earth Tech found that certain buildings had "further deteriorated since the prior inspections." In particular, while the AKRF report had found that 34 lots (51%) were in critical or poor condition, Earth Tech found that 37 sites (55%) were in critical or poor condition. In addition, Earth Tech found a "long-standing lack of investor interest in the neighborhood," demonstrated by, among other things, the paucity of new buildings constructed since 1961, as well as "the extended neglect of building maintenance" and extensive Building Code violations. In particular, Earth Tech found that, as of July 2006, "there were 410 open violations" with respect to 75% of the lots in the Project site. Accordingly, Earth Tech concluded that a majority of the buildings and lots in the Manhattanville area exhibited "substandard and deteriorated conditions" creating "a blighted and discouraging impact on the surrounding community."

On July 17, 2008, ESDC adopted a General Project Plan (hereinafter referred to as the GPP) for the Project as both a land

use improvement project and a civic project in accordance with the New York State Urban Development Corporation Act.

By notice dated August 3, 2008, ESDC advised the public that it would conduct a hearing on September 2 and 4, 2008 in connection with the proposed Project and acquisition of property within the Project site. The petitioners and others spoke at the hearing. The record of the hearing remained open for any additional written comments until October 10, 2008.

On December 18, 2008, ESDC approved its SEQRA statement of findings, adopted a modified GPP, and authorized the issuance of the determination and findings. On December 22, 2008, ESDC issued its determination and findings authorizing the acquisition of certain real property for the Project. In particular, ESDC found that "[t]he Project qualifies as both a Land Use Improvement Project and separately and independently as a Civic Project pursuant to the New York State Urban Development Corporation Act."

On February 20, 2009, two petitions were filed in this Court challenging the determination and findings. The petitioners Tuck-It-Away, Inc., Tuck-It-Away Bridgeport, Inc., Tuck-It-Away at 133rd Street, Inc. and Tuck-It-Away Associates, L.P. are owners of storage facilities located at 3261 Broadway, 614 West 131st Street, 655 West 125th Street, and 3300 Broadway. Petitioners Parminder Kaur and Amanjit Kaur are the owners of a gasoline service station located at 619 West 125th Street, and petitioner P.G. Singh Enterprises, LLP is the owner of a gasoline service station located at 673 West 125th Street. It is uncontested that the petitioners' property is within the Project site and thus is subject to condemnation.

## THE STANDARD OF REVIEW

In reviewing the determination and findings in these Eminent Domain Procedure Law (EDPL) proceedings this Court's scope of review is limited to whether (1) the proceeding was in conformity with the Federal and State Constitutions; (2) the proposed acquisition was within the condemnor's statutory jurisdiction or authority; (3) the condemnor's determination and findings were made in accordance with procedures set forth in EDPL article 2 and article 8 of the Environmental Conservation Law (SEQRA); and (4) a public use, benefit or purpose will be served by the proposed acquisition. (See EDPL 207 [C].)

A negative finding in any one of these factors necessarily dooms ESDC's determinations. The petitioners assert that

ESDC exceeded its statutory authority in designating the Project as a "Civic Project" under the Urban Development Corporation Act (hereinafter referred to as UDCA) (L 1968, ch 174, § 1, as amended [McKinney's Uncons Laws of NY § 6251 *et seq.*]). In addition, the petitioners assert that the alleged "civic" benefits of the Project are insufficient public purposes for the use of eminent domain. In particular, the petitioners assert that the expansion of a private university does not qualify as a "civic project" nor as a public purpose to justify the use of eminent domain under the EDPL. In addition, the petitioners assert that the other purported "civic purposes" and public benefits of the Project do not qualify as public purposes to justify condemnation or the designation of the Project as a "civic project" since some of the purported benefits (1) arise from preexisting obligations of Columbia; (2) primarily benefit Columbia; and (3) are pretextual, unrelated to the use of the Project or are de minimis in value.

ESDC's determination that the Project has a public use, benefit or purpose is wholly unsupported by the record and precedent. A public use or benefit must be present in order for an agency to exercise its power of eminent domain. (*See* US Const 5th Amend; NY Const, art I, § 7; EDPL 204 [B] [1].) "[T]he term 'public use' broadly encompasses any use . . . which contributes to the health, safety and general welfare of the public." (*See Matter of C/S 12th Ave. LLC v City of New York*, 32 AD3d 1, 10-11 [1st Dept 2006].) If an adequate basis for the agency's determination is shown, and the petitioner cannot show that the determination was corrupt or without foundation, the determination should be confirmed. (*See Matter of Waldo's, Inc. v Village of Johnson City*, 74 NY2d 718, 720 [1989]; *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 425 [1986]; *Kaskel v Impellitteri*, 306 NY 73, 78 [1953], *cert denied* 347 US 934 [1954].)

The UDCA defines a "civic project" as: "[a] project or that portion of a multi-purpose project designed and intended for the purpose of providing facilities for educational, cultural, recreational, community, municipal, public service or other civic purposes." (Uncons Laws § 6253 [6] [d] [UDCA § 3 (6) (d)].)

At the outset, it is important to note that as late as May 18, 2006, 2½ years into ESDC's participation project planning, the draft GPP still identified the project only as the "Manhattanville in West Harlem Land Use Improvement Project" even though there was no arguably independent blight study until

May 2008. It was not until September 2006 that the Project had "and Civic Project" added to its title, fully two years after Columbia agreed to wholly underwrite the Project.

## THE *KELO* DOCTRINE MANDATES

Any analysis of the constitutionality of ESDC's scheme for the development of Manhattanville must necessarily begin with a discussion of the most recent Takings Clause exposition by the U.S. Supreme Court in *Kelo v New London* (545 US 469 [2005]).

It is recognized that *Kelo*, as described below, did not concern an area characterized as "blighted." However, the blight designation in the instant case is mere sophistry. It was utilized by ESDC years after the scheme was hatched to justify the employment of eminent domain, but this Project has always primarily concerned a massive capital project for Columbia. Indeed, it is nothing more than economic redevelopment wearing a different face. "[E]ven where the law expressly defines the removal or prevention of 'blight' as a public purpose and leaves to the agencies wide discretion in deciding what constitutes blight, facts supporting such determination should be spelled out." (*Yonkers Community Dev. Agency v Morris*, 37 NY2d 478, 484 [1975], *appeal dismissed* 423 US 1010 [1975].) Furthermore,

> "[c]arefully analyzed, it is clear that in such situations, courts are required to be more than rubber stamps in the determination of the existence of substandard conditions in urban renewal condemnation cases. The findings of the agency are not self-executing. A determination of public purpose must be made by the courts themselves and they must have a basis on which to do so." (*Yonkers*, 37 NY2d at 485; *see Matter of City of Brooklyn [Long Is. Water Supply]*, 143 NY 596, 618 [1894], *affd* 166 US 685 [1897] ["But whether the use, for which the property is to be taken, is a public use, which justifies its appropriation, is a judicial question; upon which the courts are free to decide"].)

The determination of the *Yonkers* Court and the hoary authority of *City of Brooklyn* are still controlling precedent that require this Court not to abdicate its role to decide a "judicial question." Whether the respondent describes the use of eminent domain in Manhattanville as "urban renewal" or economic redevelopment, the question of public purpose or public use should be analyzed under the standards set out in *Kelo*.

In *Kelo*, the City of New London, a municipal corporation, and the New London Development Corporation attempted to use state law to take land to build and support economic revitalization of the city's downtown area known as Fort Trumbull. In its plan, New London divided the development into seven parcels with some of these parcels destined to be public waterways or museums. One parcel, known as lot 3, was designated to be a 90,000-square-foot high-technology research and development office complex and parking facility ultimately for the use of Pfizer pharmaceutical company.

Several plaintiffs in lot 3 challenged the taking of their property. They claimed that the condemnation of unblighted land for economic development purposes violated both the State and Federal Constitutions. More specifically, they argued that the taking of private property under Connecticut's statute and handing it over to a private party did not constitute a valid public use, or at a minimum, the public benefit was incidental to the private benefits generated. The Connecticut Supreme Court rejected their claims under both the State and Federal Constitutions. The U.S. Supreme Court granted certiorari on the federal question of whether the taking of private property for economic development purposes, when it involved transferring land from one private owner to another, constituted a valid public use under the Fifth and Fourteenth Amendments.

Justice Stevens, writing for the majority, characterized the New London program as "economic rejuvenation":

> "The City has carefully formulated an economic development plan that it believes will provide appreciable benefits to the community, including—but by no means limited to—new jobs and increased tax revenue. As with other exercises in urban planning and development, the City is endeavoring to coordinate a variety of commercial, residential, and recreational uses of land, with the hope that they will form a whole greater than the sum of its parts. To effectuate this plan, the City has invoked a state statute that specifically authorizes the use of eminent domain to promote economic development. Given the comprehensive character of the plan, the thorough deliberation that preceded its adoption, and the limited scope of our review, it is appropriate for us, as it was in *Berman*, to resolve the challenges of the individual owners, not on a piecemeal basis,

but rather in light of the entire plan." (545 US at 483-484 [footnote omitted], citing *Berman v Parker*, 348 US 26 [1954].)

The majority broke little new ground on this issue. In *Berman*, Justice Douglas, writing for the unanimous Court, upheld the District of Columbia's use of eminent domain via act of Congress to acquire, inter alia, commercial property that was, itself, not blighted. The Court stated that "[t]he concept of the public welfare is broad and inclusive . . . [and] the power of eminent domain is merely the means to the end." (348 US at 33.) The *Berman* Court elaborated on the deference due to government decisions of this type:

> "[T]he means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. The public end may be as well or better served through an agency of private enterprise than through a department of government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects." (348 US at 33-34 [citations omitted].)

The *Kelo* majority also relied heavily on *Hawaii Housing Authority v Midkiff* (467 US 229 [1984]), wherein the Court upheld a Hawaii statute that authorized the taking, under eminent domain, of fee title from large land-holding lessors and transferring it to a series of lessees. The *Kelo* majority stated that in "[r]eaffirming *Berman's* deferential approach to legislative judgments in this field, we concluded that the State's purpose of eliminating the 'social and economic evils of a land oligopoly' qualified as a valid public use." (545 US at 482, quoting *Midkiff*, 467 US at 241-242.)

The *Kelo* majority reaffirmed the broad deference accorded to the legislature in determining what constitutes a valid public use as first enunciated in *Berman*. However, Justice Kennedy, in a concurring opinion, pointed out the obligations of any court faced with challenges such as presented by ESDC's scheme to redevelop Manhattanville. He wrote specifically and separately on the issue of improper motive in transfers to private parties with only discrete secondary benefits to the public.

This is precisely the issue presented by the instant case. Justice Kennedy placed particular emphasis on the importance of the underlying planning process that ultimately called for the

exercise of the power of eminent domain, and laid out in detail the elements of the New London plan that ensured against impermissible favoritism:

(1) The city's awareness of its depressed economic condition, by virtue of a recent closing of a major employer and the state's designation of the city as a distressed municipality. (545 US at 491; *cf.* 545 US at 473.)

(2) The formulation of a comprehensive development plan meant to address a serious citywide depression. (*Id.* at 493.)

(3) The substantial commitment of public funds to the project before most of the private beneficiaries were known. (*Id.* at 491-492.)

(4) The city's review of a variety of development plans. (*Id.*)

(5) The city's choice of a private developer from a group of applicants rather than picking out a particular transferee beforehand. (*Id.*)

(6) The identities of most of the private beneficiaries being unknown at the time the city formulated its plan. (*Id.* at 493.)

(7) The city's compliance with elaborate procedural requirements that facilitate the review of the record and inquiry into the city's purposes. (*Id.*)

Justice Kennedy specifically acknowledged that "[t]here may be private transfers in which the risk of undetected impermissible favoritism of private parties is so acute that a presumption (rebuttable or otherwise) of invalidity is warranted under the Public Use Clause." (*Id.*) Although he declined to conjecture as to what sort of case might justify a more demanding standard of scrutiny, beyond finding the estimated benefits there not "*de minimis,*" it was the specific aspects of the New London planning process that convinced him to side with the majority in deference to the legislative determination. (*See id.*)

The contrast between ESDC's scheme for the redevelopment of Manhattanville and New London's plan for Fort Trumbull could not be more dramatic. Initially, it must be noted that unlike Fort Trumbull, Manhattanville or West Harlem as a matter of record was not in a depressed economic condition when EDC and ESDC embarked on their Columbia-prepared-and-financed quest. The 2002 West Harlem Master Plan stated that not only was Harlem experiencing a renaissance of economic development, but that the area had great development potential that could easily be realized through rezoning. Again, its bears repeating that the only purportedly unbiased or untainted study

that concluded that Manhattanville was blighted, and thus in need of redevelopment, was not completed until 2008: the point at which the ESDC/Columbia steamroller had virtually run its course to the fullest.

Unlike the City of New London, EDC, in conjunction with ESDC, did not endeavor to produce a comprehensive development plan to address a Manhattanville-wide economic depression. Furthermore, no municipal entity in New York committed any public funds for the redevelopment of Manhattanville. Indeed, Columbia underwrote *all* of the costs of studying and planning for what would become a sovereign-sponsored campaign of Columbia's expansion. This expansion was not selected from a list of competing plans for Manhattanville's redevelopment. Indeed, the record demonstrates that EDC committed to rezoning Manhattanville, not for the goal of general economic development or to remediate an area that was "blighted" before Columbia acquired over 50% of the property, but rather solely for the expansion of Columbia itself.

The only alternative considered was West Harlem Community Board 9's alternative New York City Charter § 197-a plan. More than 10 years in the making, Community Board 9's self-initiated comprehensive plan explicitly sought integrated and diversified development of the Manhattanville industrial area so as to maximize economic benefits to local area residents rather than just Columbia. That plan contemplated that Columbia would play an important role in the eventual redevelopment of Manhattanville. However, it explicitly rejected the use of eminent domain and exclusive Columbia control in favor of diversified development and preservation of existing businesses and jobs.

Until May 3, 2007, drafts of the Columbia GPP make no mention of Community Board 9's 197-a plan. ESDC appears to have first considered the 197-a plan in the October 12, 2007 draft of the GPP, whereupon it rejected the Community Board's plan on the ground that it *"does not meet Columbia's needs as Columbia had defined them."* When the New York City Planning Commission adopted the 197-a plan, it carved out the area sought by Columbia because it did not provide Columbia "adequate opportunity to facilitate Columbia's long-term growth." The record shows no evidence that ESDC placed any constraints upon Columbia's plans, required any accommodation of existing or competing uses, or any limitations on the scale or configuration of Columbia's scheme for the annexation of Manhattanville.

Thus, the record makes plain that rather than the identity of the ultimate private beneficiary being unknown at the time that

the redevelopment scheme was initially contemplated, the ultimate private beneficiary of the scheme for the private annexation of Manhattanville was the progenitor of its own benefit. The record discloses that every document constituting the plan was drafted by the preselected private beneficiary's attorneys and consultants and architects, from the General Project Plan, the Special District Zoning Text, the City Map Override Proposal, and the Land Use Restrictions to all phases of the environmental review. Even the blight study on which ESDC originally proposed to base its findings was prepared by Columbia's consultant AKRF, nominally retained by ESDC for the purpose, but which retention and use by ESDC was roundly condemned by this Court in *Tuck-It-Away I.*

In *Kelo*, the majority assumed that the redevelopment in question was itself a public purpose. No such assumption should be made in the instant case despite the Columbia-sponsored finding of blight.

### THERE IS NO INDEPENDENT CREDIBLE PROOF OF BLIGHT IN MANHATTANVILLE

Under the UDCA, ESDC is empowered to acquire property for a land use improvement project if it finds, in pertinent part, that "the area in which the project is to be located is a substandard or insanitary area, or is in danger of becoming a substandard or insanitary area and tends to impair or arrest the sound growth and development of the municipality." (Uncons Laws § 6260 [c] [1] [UDCA § 10 (c) (1)].) The statute states, in relevant part, that "[t]he term 'substandard or insanitary area' shall mean and be interchangeable with a slum, blighted, deteriorated or deteriorating area, or an area which has a blighting influence on the surrounding area." (Uncons Laws § 6253 [12] [UDCA § 3 (12)].) The statute's statement of legislative findings and purposes lists various "substandard, insanitary, deteriorated or deteriorating conditions" including, among other things:

> "obsolete and dilapidated buildings and structures, defective construction, outmoded design, lack of proper sanitary facilities or adequate fire or safety protection, excessive land coverage, insufficient light and ventilation, excessive population density, illegal uses and conversions, inadequate maintenance, [and] buildings abandoned or not utilized in whole or substantial part." (Uncons Laws § 6252 (UDCA § 2].)

It is important to note that the record before ESDC contains no evidence whatsoever that Manhattanville was blighted prior to Columbia gaining control over the vast majority of property therein. Only that evidence which was part of ESDC's record before it was closed on December 18, 2008 can be properly considered on the question of blight. (*See Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d at 418 ["courts reviewing compliance with statutory requirements should consider whether the agency's conclusion is supported by substantial evidence in the record that was before the agency at the time of its decision"].)

Thus, the affidavits of Dr. R. Andrew Parker, Earth Tech's principal urban planner, and Philip Pitruzzello, which were sworn to after the record was closed, cannot inform this Court's review of ESDC's determinations.[2] ESDC's reliance on CPLR 403 (b) is nothing more than an attempt to circumvent the plain language of EDPL 207 (A) and the standard of review articulated in *Jackson*. Furthermore, the use of the subsequently crafted affidavits would preclude the petitioners from responding to the averments contained therein before the agency charged with the power of eminent domain.

It is critical to recognize that EDC's 2002 West Harlem Master Plan which was created prior to the scheme to balkanize Manhattanville for Columbia's benefit found no blight, nor did it describe any blighted condition or area in Manhattanville. Instead, as described above, the Plan noted that West Harlem had great potential for development that could be jump-started with rezoning. It was only after the Plan was published in August 2002 that the rezoning of the "upland" area was essentially given over to the unbridled discretion of Columbia. In little more than a year from publication of the Plan, EDC joined with *Columbia* in proposing the use of eminent domain to allow Columbia to develop Manhattanville for Columbia's sole benefit.

This ultimately became the defining moment for the end game of blight. Having committed to allow Columbia to annex Manhattanville, the EDC and ESDC were compelled to engineer a public purpose for a quintessentially private development: eradication of blight.

From this point forward, Columbia proceeded to acquire by lease or purchase a vast amount of property in Manhattanville.

---

**2.** It is ironic that the respondent has urged this Court to consider the Parker and Pitruzzello affidavits while simultaneously defending the closing of the record despite the petitioners' protests that it was incomplete.

It is apparent from the record that ESDC had no intention of determining if Manhattanville was blighted prior to, or apart from Columbia's control of the area. Though ESDC staff expressed concern about the sufficiency of the Urbitran study as early as December 15, 2004, it made no move towards independently ascertaining conditions in the area until late March 2006. Indeed, ESDC only commissioned a new study on September 11, 2006. From its first meeting with Columbia in September 2003, ESDC received regular updates about Columbia's property acquisitions in the area. On August 1, 2005, ESDC solicited reports about the parcels that were not owned by Columbia. Throughout this time Columbia not only purchased or gained control over most of the properties in the area, but it also forced out tenant businesses, ultimately vacating, in 17 buildings, 50% or more of the tenants. The petitioners clearly demonstrate that Columbia also let water infiltration conditions in property it acquired go unaddressed, even when minor and economically rational repairs could arrest deterioration. Columbia left Building Code violations open, and let tenants use premises in violation of local codes and ordinances by parking cars on sidewalks and obstructing fire exits, and maintaining garbage and debris in certain buildings over a period of years.

Thus, ESDC delayed making any inquiry into the conditions in Manhattanville until long after Columbia gained control over the very properties that would form the basis for a subsequent blight study. This conduct continued when ESDC authorized AKRF to use a methodology biased in Columbia's favor. Specifically, AKRF was to "highlight" such blight conditions as it found, and it was to prepare individual building reports "focusing on characteristics that demonstrate blight conditions."

This search for distinct "blight conditions" led to the preposterous summary of building and sidewalk defects compiled by AKRF, which was then accepted as a valid methodology and amplified by Earth Tech. Even a cursory examination of the study reveals the idiocy of considering things like unpainted block walls or loose awning supports as evidence of a blighted neighborhood. Virtually every neighborhood in the five boroughs will yield similar instances of disrepair that can be captured in close-up technicolor.

ESDC originally specified that AKRF should study trends in real estate values and rental demand, and though its counsel requested that AKRF evaluate building conditions at the time Columbia acquired them, AKRF's final report included none of

this evidence or any analysis derived therefrom. Even when ESDC abandoned AKRF, it nonetheless requested that its subsequent consultant, Earth Tech, "replicate" the AKRF study using the same flawed methodology.

The "no blight" study proffered by the petitioners sets forth all of the factors that AKRF, Earth Tech and ESDC should have considered, but did not, to arrive at any conclusion that Manhattanville was, or was not, blighted. The study contains an analysis of real estate values, rental demand, rezoning applications and multiple prior proposals for the development of Manhattanville's waterfront and new commercial ventures, all omitted from ESDC's studies. ESDC failed to demonstrate any significant health or safety issues other than minor code violations that exist throughout the city, but more particularly in the buildings controlled by Columbia.

## THE FOLLY OF UNDERUTILIZATION

The most egregious conclusion offered in support of the finding of blight is that of underutilization. AKRF and Earth Tech allege the existence of blight from, inter alia, the degree of utilization, or percentage of maximum permitted floor area ratio (FAR) to which lots are built. The theoretical justification for using the degree of utilization of development rights as an indicator of blight is the inference that it reflects owners' inability to make profitable use of full development rights due to lack of demand. Lack of demand can only be determined in relation to FAR when combined with the zoning for the area in question. Manhattanville, for the relevant period, was zoned to allow maximum FAR of two, leaving owners essentially with a choice between a one- or two-story structure. No rationale was presented by the respondent for the wholly arbitrary standard of counting any lot built to 60% or less of maximum FAR as constituting a blighted condition. To the contrary, the New York City Department of City Planning uses a 50% standard to identify "underbuilt" lots. The petitioners accurately contend that while in a mid-rise residential area, or a high-rise business district, a 60% figure might have some meaning as an indicator of demand, in an area zoned for a maximum of two stories, it effectively requires owners to build to the maximum allowable FAR. The M-1, M-2, and M-3 zoning of the Manhattanville industrial area was specifically intended, however, for uses in which a single story structure may be preferable. In our view, a 50% use of a permissible FAR of two does not, a fortiori, reflect

a lack of demand. Moreover, for uses requiring loading docks, or storage of trucks or heavy equipment, or gas stations, for example, full lot coverage is not desirable. In an area zoned for such uses, utilization of 40% of FAR would be perfectly appropriate before any inference of insufficient demand can reasonably be made. The difference between AKRF's 60% standard and the petitioners' "no blight" study's 40% standard is the difference between 39% of the area and 20% of the area being counted as "underutilized."

The time has come to categorically reject eminent domain takings solely based on underutilization. This concept put forward by the respondent transforms the purpose of blight removal from the elimination of harmful social and economic conditions in a specific area to a policy affirmatively requiring the ultimate commercial development of all property regardless of the character of the community subject to such urban renewal. (*See Gallenthin Realty Dev., Inc. v Borough of Paulsboro*, 191 NJ 344, 365, 924 A2d 447, 460 [2007] ["Under that approach, any property that is operated in a less than optimal manner is arguably 'blighted.' If such an all-encompassing definition of "blight" were adopted, most property in the State would be eligible for redevelopment"]; *In re Condemnation by Redevelopment Auth. of Lawrence County, Absolute Tit. of Land of Hamilton*, 962 A2d 1257, 1265 [Pa 2008], *appeal denied* 973 A2d 1008 [Pa 2009] [holding use to less than full potential does not constitute "economically undesirable" land use]; *Sweetwater Val. Civic Assn. v City of Natl. City*, 18 Cal 3d 270, 555 P2d 1099 [1976]; *Southwestern Ill. Dev. Auth. v National City Envtl., L.L.C.*, 304 Ill App 3d 542, 556, 710 NE2d 896, 906 [1999, concurring op], *affd* 199 Ill 2d 225, 768 NE2d 1 [2002], *cert denied* 537 US 880 [2002] ["If a government agency can decide property ownership solely upon its view of who would put that property to more productive or attractive use, the inalienable right to own and enjoy property to the exclusion of others will pass to a privileged few who constitute society's elite"].)

In New York, wherever underutilization has been a significant factor in a blight finding, courts have upheld the finding only in connection with other factors such as zoning defects rendering the property unusable or insufficiently sized or configured lots. (*Matter of Haberman v City of Long Beach*, 307 AD2d 313 [2d Dept 2003], *appeal dismissed* 1 NY3d 535 [2003], *cert dismissed* 543 US 1086 [2005]; *see Matter of Horoshko*, 90 AD2d 850 [2d Dept 1982].)

In this case, the record overwhelmingly establishes that the true beneficiary of the scheme to redevelop Manhattanville is not the community that is supposedly blighted, but rather Columbia University, a private elite education institution. These remarkably astonishing conflicts with *Kelo* on virtually every level cannot be ignored, and render the taking in this case unconstitutional.

## THERE IS NO CIVIC PURPOSE TO THIS USE OF EMINENT DOMAIN

The use of eminent domain should also be rejected on the grounds that Columbia's expansion is not a "civic project." (*See* Uncons Laws § 6253 [6] [d] [UDCA § 3 (6) (d)].) ESDC states that the Project will be used by Columbia for "education related uses," and thus the Project serves a civic purpose. The petitioners correctly contend that within the definition of Unconsolidated Laws § 6253 (6) (d) (UDCA § 3 [6] [d]), a private university does not constitute facilities for a "civic project." The statutory definition does refer to educational uses, but the final clause "or other civic purposes" clearly restricts the educational purposes qualifying for a civic project to only such educational purposes as constitute a "civic purpose."

There is little precedent on precisely this question, and what there is to guide us augurs powerfully against the respondent. In *Matter of Fisher (New York State Urban Dev. Corp.)* (287 AD2d 262, 263 [1st Dept 2001]), this Court affirmed the condemning agency's findings that the condemnation of a building for the construction of new New York Stock Exchange facilities would "result in substantial public benefits, among them increased tax revenues, economic development and job opportunities as well as preservation and enhancement of New York's prestigious position as a worldwide financial center." Here, Columbia is virtually the sole beneficiary of the Project. This alone is reason to invalidate the condemnation especially where, as here, the public benefit is incrementally incidental to the private benefits of the Project.

Although, as the petitioners note, there does not appear to be any New York case involving the condemnation of property for the purpose of expanding a private university, a California court held that a private university could acquire private land under its power of eminent domain for the purpose of landscaping and "beautify[ing]" the grounds surrounding a newly constructed university library. (*See University of S. Cal. v Robbins*, 1 Cal

App 2d 523, 525, 37 P2d 163, 164 [1934], *cert denied* 295 US 738 [1935].) The California court reasoned that "[t]he higher education of youth in its largest implications is recognized as a most important public use, vitally essential to our governmental health and purposes." (*Robbins*, 1 Cal App 2d at 530, 37 P2d at 166.) However, this case offers little support for the respondent's position. In *Robbins*, the grant of eminent domain power to a tax-exempt educational institution was a creature of state law. No such legislative grant is present in the instant case. Furthermore, neither ESD nor ESDC based the use of eminent domain on Columbia's tax-exempt status.

At least one court in New York has acknowledged, in dicta, that private institutions of higher learning serve important public purposes (*see Matter of Board of Educ., Union Free School Dist. No. 2 v Pace Coll.*, 27 AD2d 87, 91 [2d Dept 1966]), but this case reaches a conclusion directly contrary to the respondent's argument. In *Pace*, a local school board sought to acquire, by condemnation, land that Pace College purchased for the purpose of expanding its facilities (*see* 27 AD2d at 88). The Second Department held that Pace, a private college, could not resist appropriation of the land by invoking the defense that such land was being used for public purposes, since such a defense "is available only to a property owner who has been granted a power to condemn equivalent to that of the petitioning condemnor" and "Pace has been granted no such power" (27 AD2d at 89). While noting that Pace College "performs an admittedly useful service to the community and one in which the public has such vital interest that the State undertakes to regulate and control closely those institutions which engage therein" (27 AD2d at 91), the Second Department refused to consider whether Pace's character as an education institution would immunize it from the use of eminent domain by a local school board under the defense of prior public use. The Court explicitly rejected Pace's contention that its tax-exempt status conferred such immunity:

> "Nor do we find it persuasive that the State, in order to encourage and assist the development of private educational institutions such as Pace College, has conferred upon them an exemption from the operation of certain tax laws. The fallacy of the argument urged upon us that an educational corporation receives such an exemption upon the principle of nontaxation of public places and as a '*quid pro*

*quo'* for the institution's performance of a public function has been demonstrated elsewhere." (*Pace*, 27 AD2d at 91 [citations omitted].)

Were we to grant civic purpose status to a private university for purposes of eminent domain, we are doing that which the Legislature has explicitly failed to do: as in California and Connecticut, that decision is solely the province of the state legislature.

## THE UDCA IS UNCONSTITUTIONAL AS APPLIED IN THIS CASE

The petitioners assert, inter alia, that the UDCA is unconstitutional as applied by ESDC because the agency has failed to adopt, retain or promulgate any regulation or written standard for the finding of blight. The petitioners argue that the statute fails to give owners notice of what constitutes a blighted area and thus penalizes them for investing in land that may be taken away. In addition, the petitioners assert that the statute permits and encourages ESDC to apply the law in an arbitrary and discriminatory fashion to favor developers like Columbia. In support, the petitioners note that AKRF, the consultant for this Project, as well as the Atlantic Yards project, used different standards for determining blight. For example, the petitioners noted that in the Atlantic Yards study, AKRF considered buildings that are at least 50% vacant to exhibit blight, whereas in this Project AKRF considered a vacancy rate of 25% or more to be substandard. We agree with the petitioners' contentions and find that the statute is unconstitutional as applied.

"[C]ivil as well as penal statutes can be tested for vagueness under the due process clause." (*Montgomery v Daniels*, 38 NY2d 41, 58 [1975]; *see* US Const 14th Amend; NY Const, art I, § 6.) Due process requires that a statute be sufficiently definite "so that individuals of ordinary intelligence are not forced to guess at the meaning of statutory terms." (*Foss v City of Rochester*, 65 NY2d 247, 253 [1985]; *see People v Stuart*, 100 NY2d 412, 420 [2003].)

While the words "substandard or insanitary area" are not unconstitutionally vague, this does not necessarily end the inquiry. While these are abstract words, they have been interpreted and applied in the past without constitutional difficulty. (*See e.g. Matter of Develop Don't Destroy [Brooklyn] v Urban Dev. Corp.*, 59 AD3d 312 [1st Dept 2009].) Indeed, in *Berman v Parker* (348 US 26 [1954]), the Supreme Court held that a

District of Columbia redevelopment act allowing for the elimination of "substandard housing and blighted areas" was "sufficiently definite" even though the term "blighted areas" was not defined and the term "substandard housing" was defined broadly to include "lack of sanitary facilities, ventilation, or light, . . . dilapidation, overcrowding, faulty interior arrangement, or any combination of these factors." (348 US at 28, 28 n 1, 35.) The Court found that "the standards prescribed were adequate . . . to eliminate not only slums . . . but also the blighted areas that tend to produce slums." (*Id.* at 35.)

> "The public evils, social and economic[,] of [unwholesome] conditions [in the slums] are unquestioned and unquestionable. Slum areas are the breeding places of disease which take toll not only from denizens, but, by spread, from the inhabitants of the entire city and State. Juvenile delinquency, crime and immorality are there born, find protection and flourish. Enormous economic loss results directly from the necessary expenditure of public funds to maintain health and hospital services for afflicted slum dwellers and to war against crime and immorality . . . Time and again . . . the use by the Legislature of the power of taxation and of the police power in dealing with the evils of the slums, has been upheld by the courts. Now, in continuation of a battle, which if not entirely lost, is far from won, the Legislature has resorted to the last of the trinity of sovereign powers by giving to a city agency the power of eminent domain." (*New York City Hous. Auth. v Muller*, 270 NY 333, 339 [1936].)

Long after the U.S. Supreme Court decided *Berman*, the Ohio Supreme Court was faced with a statute virtually identical to that employed in the instant case, in *Norwood v Horney* (110 Ohio St 3d 353, 853 NE2d 1115 [2006)]). The *Norwood* court noted that "[i]nherent in many decisions affirming pronouncements that economic development alone is sufficient to satisfy the public-use clause is an artificial judicial deference to the state's determination that there was sufficient public use." (110 Ohio St 3d at 371, 853 NE2d at 1136.) Nevertheless, the court invalidated the Norwood City Code:

> "Rather than affording fair notice to the property owner, the Norwood Code merely recites a host of subjective factors that invite ad hoc and selective

enforcement—a danger made more real by the malleable nature of the public-benefit requirement. We must be vigilant in ensuring that so great a power as eminent domain, which historically has been used in areas where the most marginalized groups live, is not abused." (*Norwood*, 110 Ohio St 3d at 382, 853 NE2d at 1145.)

The UDCA suffers the same vagueness as the Norwood Code. The application of the UDCA by the various agencies in this case has resulted in "ad hoc and selective enforcement" as evidenced by the greatly divergent criteria used to define blight. The differences between the blight studies in *Develop Don't Destroy (Brooklyn)* for Atlantic Yards and in the instant case, both performed by the same consultant, highlight the unconstitutional application of the UDCA. One is compelled to guess what subjective factors will be employed in each claim of blight.

## THE UNCONSTITUTIONAL CLOSURE OF THE ADMINISTRATIVE RECORD

The petitioners correctly contend that when the respondent intentionally limited the administrative record by arbitrarily closing it, while simultaneously withholding documents that the petitioners are legally entitled to receive, it deprived the petitioners of a reasonable opportunity to be heard. Furthermore, we agree the petitioners were prevented from creating a full record for review by this Court, in violation of EDPL 203 and the petitioners' due process rights under the Fourteenth Amendment of the United States Constitution and article I, § 6 of the New York Constitution.

The EDPL requires that at the administrative hearing, prior to the close of the record, the condemnee shall be given a "reasonable opportunity" to be heard and an opportunity to "submit other documents concerning the proposed public project" into the record. (EDPL 203.) A full administrative record is critical for the obvious reason that judicial review of a condemnation decision under the EDPL is limited to issues, facts, and objections entered into the record at the condemnation hearing. (EDPL 202 [C] [2]; 207 [A], [B].) The Second Circuit, in *Brody v Village of Port Chester* (434 F3d 121, 134 [2005]), emphasized that point: "[T]he procedures that are available are indeed limited in scope. The Appellate Division, which has exclusive jurisdiction over the review, will only consider the issues resolved by the legislative determination. Furthermore, the review is

limited to the record before the condemnor at the time of the determination."

Additionally, any challenge to ESDC's determination is limited to that contained in the record on which the agency based its determination. The petitioners clearly had no ability under the EDPL to call witnesses to supplement the record, introduce further evidence, cross-examine the respondent's witnesses who submitted expert affidavits after the record was closed or submit argument in opposition to those untimely expert affidavits. More importantly, the petitioners filed numerous FOIL requests seeking information about the Columbia plan and the process utilized by ESDC. The respondent vigorously opposed some of those FOIL requests which ultimately led to several Supreme Court orders requiring disclosure and our decision in *Tuck-It-Away I*.

It is beyond dispute that, as the cutoff date to enter documents into the record approached, the respondent and other agencies engaged in a last-ditch effort to thwart the petitioners' attempt to obtain documents, including those which were ordered by the courts of this State to be released and turned over to the petitioners. The respondent moved for reargument, or in the alternative, for leave to appeal from this Court's ruling in *Tuck-It-Away* and *Matter of West Harlem Bus. Group v Empire State Dev. Corp.*, which motion this Court denied in its entirety on January 27, 2009. (2009 NY Slip Op 61948[U] [1st Dept 2009], *lv granted* 12 NY3d 708 [2009].) Nonetheless, in making the motion, the respondent invoked an automatic stay of the decision, under CPLR 5519. Similarly, the New York City Department of City Planning moved to reargue Supreme Court's decision ordering disclosure of Columbia-related documents based on the holding of *Tuck-It-Away I*. The respondent and other cooperating agencies, therefore, by virtue of section 5519, were provided the opportunity to withhold documents that this Court and Supreme Court ordered released, while at the same time closing the record to prevent these documents from being submitted into the record. The appeals and reargument motions became the sine qua non of the various agencies' noncompliance with FOIL. Similarly, the petitioners' efforts to extend the deadline for closing the record were vigorously rebuffed by ESDC. ESDC's actions deprived the petitioners of a reasonable opportunity to be heard under EDPL 203 and violated their due process rights under the Fourteenth Amendment of the United State Constitution and article I, § 6 of the New York Constitution.

Many commentators have noted that "[f]ew policies have done more to destroy community and opportunity for minorities than eminent domain. Some three to four million Americans, most of them ethnic minorities, have been forcibly displaced from their homes as a result of urban renewal takings since World War II." (Beito and Somin, *Battle over Eminent Domain is Another Civil Rights Issue*, Kansas City Star, Apr. 27, 2008 [available at http://www.cato.org/pub_display.php?pub_id=9361].) The instant case is clear evidence of that reality. The unbridled use of eminent domain not only disproportionately affects minority communities, but threatens basic principles of property as contained in the Fifth Amendment. In her dissent in *Kelo*, Justice O'Connor warned that

> "[t]oday the Court abandons this long-held, basic limitation on government power. Under the banner of economic development, all private property is now vulnerable to being taken and transferred to another private owner, so long as it might be upgraded—*i.e.*, given to an owner who will use it in a way that the legislature deems more beneficial to the public—in the process. To reason, as the Court does, that the incidental public benefits resulting from the subsequent ordinary use of private property render economic development takings 'for public use' is to wash out any distinction between private and public use of property—and thereby effectively to delete the words 'for public use' from the Takings Clause of the Fifth Amendment." (*Kelo*, 545 US at 494.)

Justice O'Connor's admonition is equally true in this case in that

> "[a]ny property may now be taken for the benefit of another private party, but the fallout from this decision will not be random. The beneficiaries are likely to be those citizens with disproportionate influence and power in the political process, including large corporations and development firms. As for the victims, the government now has license to transfer property from those with fewer resources to those with more. The Founders cannot have intended this perverse result. '[T]hat alone is a *just* government,' wrote James Madison, 'which *impartially* secures to

every man, whatever is his *own.*' For the National Gazette, Property (Mar. 27, 1792) reprinted in 14 Papers of James Madison 266 (R. Rutland et al. eds. 1983)." (545 US at 505.)

It is not necessary to reach the position that *Kelo* was wrongly decided to invalidate the proposed takings in this case. The sharp differences between this case and the careful plan drafted by New London and described by the *Kelo* majority could not be more compelling.

Accordingly, the petitions brought in this Court pursuant to Eminent Domain Procedure Law § 207 challenging the determination of respondent New York State Urban Development Corporation, doing business as Empire State Development Corporation, dated December 18, 2008, which approved the acquisition of certain real property for the project commonly referred to as the Columbia University Educational Mixed Use Development Land Use Improvement and Civic Project, should be granted, and the determination annulled.

RICHTER, J. (concurring). Under the circumstances presented here, Empire State Development Corporation's (ESDC) premature closing of the agency record, while it continued to withhold relevant documents this Court had ordered disclosed under the Freedom of Information Law (FOIL), violated both the EDPL and procedural due process under the State and Federal Constitutions. I write separately to explain my reasoning.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment" (*Mathews v Eldridge*, 424 US 319, 332 [1976]). The essence of procedural due process is notice and an opportunity to be heard (*id.* at 333; *Matter of Quinton A.*, 49 NY2d 328, 334 n [1980]). In the context of eminent domain, "[t]he constitutional requirement with respect to notice . . . concerns the opportunity to be heard on the issues of compensation and public use" (*Fifth Ave. Coach Lines v City of New York,* 11 NY2d 342, 348 [1962]; *accord County of Monroe v Morgan*, 83 AD2d 777, 778 [1981]). The opportunity to be heard in condemnation proceedings is also mandated by the EDPL which requires a public hearing (EDPL 201), where the attendees must be given a "reasonable opportunity" to present oral or written statements and to "submit other documents concerning the proposed public project" (EDPL 203).

In determining whether a procedural due process violation has occurred, courts must balance the property owner's

interests against the government's interests (*Matter of Zaccaro v Cahill*, 100 NY2d 884, 890 [2003]). In doing so, the following factors must be weighed: (i) the private interest that will be affected by the official action; (ii) the risk of erroneous deprivation of such interest by the procedures employed, and the probable value, if any, of additional procedural safeguards; and (iii) the State's interest, including the function involved and the fiscal and administrative burdens that such additional procedural requirements would entail (*Pringle v Wolfe*, 88 NY2d 426, 431 [1996], *cert denied* 519 US 1009 [1996]).

The balancing of these factors leads me to conclude that, under the unique circumstances presented, Tuck-It-Away's procedural due process and statutory rights were violated by ESDC's refusal to keep the record open until the conclusion of the FOIL litigation initiated by Tuck-It-Away.[1] As to the first due process factor, the private interest affected here is substantial. Tuck-It-Away stands to lose the four properties it owns in the Manhattanville area where it conducts its self-storage business.[2]

The second factor—the risk of erroneous deprivation of Tuck-It-Away's properties by the closing of the agency record and the probable value of holding the record open until all of the withheld FOIL documents were produced—requires review of Tuck-It-Away's claims. A condemnation can be set aside if it was made in bad faith (*Matter of 49 WB, LLC v Village of Haverstraw*, 44 AD3d 226, 238-239 [2007]; *Greenwich Assoc. v Metropolitan Transp. Auth.*, 152 AD2d 216, 221 [1989], *appeal dismissed sub nom. Matter of Regency-Lexington Partners v Metropolitan Transp. Auth.*, 75 NY2d 865 [1990]) or under the pretext of a public purpose when the actual purpose was to bestow a private benefit (*Kelo v New London*, 545 US 469, 478 [2005]; *Matter of Goldstein v New York State Urban Dev. Corp.*, 64 AD3d 168, 183 [2009]). Here, Tuck-It-Away points to evidence suggesting that ESDC's findings of blight and civic purpose were made in bad faith and were pretextual, and that the real reason for the condemnation was not to further any public purpose but rather to benefit Columbia, a private developer.

---

1.  Tuck-It-Away shall refer, individually and collectively, to each of the four named petitioners in the first captioned matter.

2.  Although the Kaur petitioners do not raise a due process claim, the devastating consequence of the loss of their property equals that of Tuck-It-Away.

At the heart of Tuck-It-Away's bad faith/pretext argument lies what this Court has described as the "tangled relationships of Columbia, ESDC and their shared consultant, AKRF" (*Matter of Tuck-It-Away Assoc., L.P. v Empire State Dev. Corp.*, 54 AD3d 154, 166 [2008], *lv granted* 12 NY3d 708 [2009]). In that decision, we found that AKRF's simultaneous representation of both ESDC and Columbia created "an inseparable conflict" for purposes of FOIL (*Tuck-It-Away*, 54 AD3d at 164). In light of the fact that AKRF was serving two masters, we concluded that there was reason to doubt AKRF's independence and objectivity (54 AD3d at 165).

Although ESDC subsequently hired another consultant—Earth Tech—to prepare a neighborhood conditions study, the record raises questions as to whether, in doing so, ESDC sought and obtained a truly independent analysis. The contract retaining Earth Tech does not require it to do a de novo study, but rather it was retained to examine the information in the AKRF study. If AKRF, due to its preexisting relationship with Columbia, used a flawed or biased methodology to evaluate neighborhood conditions in order to reach the result Columbia wanted, any such flaws or biases would necessarily have been carried over to the Earth Tech study. Furthermore, ESDC's determination and findings explicitly acknowledge that it "relied upon the facts and analyses set forth in the [AKRF study]" in exercising its condemnation power.

There are serious legal questions about whether the proposed development constitutes a "civic project" under the Urban Development Corporation Act (UDCA) (McKinney's Uncons Laws of NY § 6251 *et seq.* [L 1968, ch 174, § 1, as amended]). In the absence of a civic purpose, the only possible basis for ESDC's exercise of eminent domain would rest on a finding of blight. Thus, in light of the significant questions raised concerning ESDC's alleged bad faith and improper motives, I find that ESDC should not have closed the agency record prior to the conclusion of the FOIL litigation.[3]

The final factor—the State's interest and the burdens of keeping the record open—weighs in favor of Tuck-It-Away. The wrongfulness of ESDC's actions becomes apparent by examining the history of Tuck-It-Away's efforts to obtain documents

---

**3.** Neither the briefs nor oral argument established the precise number or nature of the withheld documents, though there are letters in the voluminous record on appeal which suggest that ESDC may have voluntarily produced some of the documents we ordered disclosed.

from the agency. In 2005 and 2006, Tuck-It-Away and West Harlem Business Group (WHBG), an association of which Tuck-It-Away is a member, made a number of requests to ESDC under FOIL seeking records relating to the project and planning activities. Although ESDC produced some records, others were withheld. Tuck-It-Away and WHBG brought CPLR article 78 petitions challenging ESDC's determination and Supreme Court ordered the agency to turn over certain records, which we affirmed.

The public hearing on the condemnation was held on September 2 and 4, 2008, just six weeks after our decision, and the record was scheduled to be closed on October 10. Clearly, had ESDC complied with this Court's order and turned over all the documents, Tuck-It-Away could have submitted that information for inclusion in the record.[4] Instead, by seeking reargument of our decision and leave to appeal to the Court of Appeals, ESDC gained the benefit of the automatic statutory stay of our order (CPLR 5519) thereby keeping the withheld documents out of the agency record. Although, as the dissent notes, Tuck-It-Away did not seek to vacate the automatic stay, this does not alter the legal analysis as to whether ESDC's subsequent closing of the record violated due process.

In addition, ESDC denied Tuck-It-Away's request to keep the record open until the resolution of the FOIL litigation and vigorously opposed Tuck-It-Away's attempt in Supreme Court to enjoin the agency from closing the record. Although a temporary restraining order was obtained, on October 30, 2008, Supreme Court vacated that order and dismissed Tuck-It-Away's challenge. That same day, ESDC closed the agency record, thus thwarting Tuck-It-Away's opportunity to submit the withheld documents.

ESDC has failed to convincingly explain why it did not adjourn the condemnation hearing until after the FOIL litigation was resolved. Indeed, EDPL 203 explicitly provides that "[f]urther adjourned hearings may be scheduled." Tellingly, ESDC does not argue that the relatively short delay in the hearing pending resolution of the FOIL litigation would have negatively impacted the project, which had been in planning as early as 2002 and whose construction is scheduled to take place in two phases over the course of 25 years. In *Matter of East Thirteenth*

---

4. No argument can be made that Tuck-It-Away did not act diligently in trying to obtain the records because the relevant FOIL request was made a full two years before the public hearing was held.

*St. Community Assn. v New York State Urban Dev. Corp.* (84 NY2d 287 [1994]), the Court of Appeals noted that the drafters of the EDPL recognized that increased public participation could delay projects, but also believed that requirements of notice and a hearing could forestall the increasing amount of litigation (84 NY2d at 294).

ESDC maintains that the premature closing of the record is of no legal significance because Tuck-It-Away was provided with ample opportunity to be heard through testimony at the public hearing and submission of documents into the record. However, "[a] due process right to be heard requires an opportunity to be heard 'at a meaningful time and in a meaningful manner' " (*Rao v Gunn*, 73 NY2d 759, 763 [1988], quoting *Armstrong v Manzo*, 380 US 545, 552 [1965]). In light of the withholding of critical documents which were ordered disclosed by this Court, the opportunity provided to Tuck-It-Away here was not meaningful within the spirit of due process.

ESDC unpersuasively argues that a ruling in Tuck-It-Away's favor on this particular issue would require future condemning authorities to litigate every disputed issue through to the Court of Appeals before exercising their power of eminent domain. Due process, however, is a flexible concept whose procedural protections must be tailored to the particular facts at hand (*Curiale v Ardra Ins. Co.*, 88 NY2d 268, 274 [1996]; *Matter of Weeks Mar. v City of New York*, 291 AD2d 277, 278 [2002]). Thus, "not all situations calling for procedural safeguards call for the same kind of procedure" (*Morrissey v Brewer*, 408 US 471, 481 [1972]). Merely because I find a due process violation here does not mean that in every case, all FOIL requests must be resolved before an agency can condemn property. Nor do I find, as Tuck-It-Away urges, that due process requires a full trial court review, including discovery, cross-examination and a jury trial. However, the confluence of factors here, including the evidence raising questions of bad faith and pretext, Tuck-It-Away's protracted effort to obtain the withheld documents and ESDC's denial of the request to keep the record open while exercising its right to stay this Court's order requiring disclosure leads me to conclude that a due process violation has occurred in this case.

The finding of a due process violation here is not in conflict with *Brody v Village of Port Chester* (434 F3d 121 [2005]). In *Brody*, the Second Circuit held that the EDPL's procedures for reviewing condemnation findings do not violate the Federal Constitution (434 F3d at 123). The Second Circuit, however,

neither addressed the state constitutional issues nor did it decide whether a due process violation could occur if the State's actions interfere with a property owner's right to obtain meaningful review in this Court.

ESDC'S reliance on *Matter of Waldo's, Inc. v Village of Johnson City* (141 AD2d 194, 199 [1988], *affd* 74 NY2d 718 [1989]) is misplaced. In *Waldo's*, the petitioner maintained that the public hearing was invalid in part because the respondent refused to provide full and complete information about the project's funding and denied it the opportunity to cross-examine witnesses at the hearing. The Court denied the due process claim and found that the petitioner did in fact receive an answer to its question on funding and that there was no right to an adversarial hearing. Here, in contrast, there is no dispute that at the time the record was closed, Tuck-It-Away had not received all the documents this Court ordered turned over.

*Lawrence v Baxter* (2004 WL 1941347, *3, 2004 US Dist LEXIS 18022, *8-10 [WD NY 2004], *affd* 139 Fed Appx 365 [2d Cir 2005]), cited by ESDC as support for denying Tuck-It-Away's due process claim, has no applicability to this dispute. *Lawrence*, a 42 USC § 1983 case having nothing to do with eminent domain, merely held that for due process purposes, a plaintiff has no property interest in obtaining documents under FOIL. The court dismissed the plaintiff's due process claim because he failed to allege that he was deprived of a property interest protected by the United States Constitution. Here, however, the property interest asserted is not the documents themselves, but rather Tuck-It-Away's four buildings. Thus, *Lawrence* is irrelevant to the due process analysis here.

Because the condemnation proceeding was neither "in conformity with the federal and state constitutions" (EDPL 207 [C] [1]) nor "in accordance with procedures set forth in [the EDPL]" (EDPL 207 [C] [3]), ESDC's determinations and findings should be rejected. Since the determination must be annulled based on ESDC's premature closing of the record, it is not necessary for me to address the other statutory and constitutional issues presented by this case.

TOM, J. (dissenting). At issue on this appeal is the acquisition of approximately 17 acres in the Manhattanville area of West Harlem by Columbia University for the development of its campus. In addition to up to 16 new buildings, a multi-level below-grade facility and the adaptive reuse of an existing build-

ing, the project would create approximately two acres of publicly accessible open space, a market along 12th Avenue and widened tree-lined sidewalks. The General Project Plan adopted by Empire State Development Corporation (ESDC), as modified, states that the project, inter alia, will maintain the City and State of New York as a leading center of higher education and academic research by providing state-of-the-art facilities and provide the community with employment opportunities and civic amenities.

Petitioners own property subject to condemnation located within the project site, which extends from West 125th Street to West 133rd Street and from Broadway and Old Broadway to 12th Avenue. They brought this proceeding to challenge ESDC's determination that the project qualifies not only as a land use improvement project but also, discretely, as a civic project pursuant to the New York State Urban Development Corporation Act ([UDCA] L 1968, ch 174, § 1, as amended) (McKinney's Uncons Laws of NY § 6253 [6] [c], [d] [UDCA § 3 (6) (c), (d)]).

I do not accept petitioners' contention that the project neither qualifies as a civic project nor serves a public purpose and, thus, that ESDC exceeded its statutory authority in designating the project a civic project pursuant to Unconsolidated Laws § 6260 (d) (UDCA § 10 [d]). Under the UDCA, such designation is conditioned upon findings that "there exists in the area in which the project is to be located, a need for the educational, cultural, recreational, community, municipal, public service or other civic facility to be included in the project" (Uncons Laws § 6260 [d] [1]) and that "the project shall consist of a building or buildings or other facilities which are suitable for educational, cultural, recreational, community, municipal, public service or other civic purposes" (Uncons Laws § 6260 [d] [2]). A private institution of higher learning serves a public purpose (*see University of S. Cal. v Robbins*, 1 Cal App 2d 523, 37 P2d 163 [1934], *cert denied* 295 US 738 [1935]). In any event, ESDC's finding that the project will serve a public purpose by providing, among other things, needed educational facilities in the area in which it is to be located is neither irrational nor baseless.

Property is subject to acquisition in connection with a land use improvement project upon ESDC's finding, inter alia, that "the area in which the project is to be located is a substandard or insanitary area, or is in danger of becoming a substandard or insanitary area" (Uncons Laws § 6260 [c] [1]). "Substandard or insanitary area," by definition, is "interchangeable with a slum,

blighted, deteriorated or deteriorating area, or an area which has a blighting influence on the surrounding area" (Uncons Laws § 6253 [12]). Various conditions constituting blight are set forth in the UDCA's statement of legislative findings and purposes (Uncons Laws § 6252 [UDCA § 2]). Contrary to petitioners' contention, the term "substandard or insanitary area" is not unconstitutionally vague. Though abstract, these words have been interpreted and applied without constitutional difficulty (*see Berman v Parker*, 348 US 26 [1954]; *see also Yonkers Community Dev. Agency v Morris*, 37 NY2d 478, 483 [1975], *appeal dismissed* 423 US 1010 [1975]).

I further reject petitioners' argument that ESDC's finding of blight was insufficient as a matter of law and fact and that it was arrived at corruptly and in bad faith (*see Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 425 [1986]; *Kaskel v Impellitteri*, 306 NY 73, 79 [1953], *cert denied* 347 US 934 [1954]). Two blight studies documented substandard and insanitary conditions by photographic evidence and other indicia. Petitioners present merely "a difference of opinion" with the conclusions to be drawn from this evidence, in which event the courts are bound to defer to the agency (*Matter of Develop Don't Destroy [Brooklyn] v Urban Dev. Corp.*, 59 AD3d 312, 324 [2009]). As the Court of Appeals recently stated:

> "It is quite possible to differ with ESDC's findings that the blocks in question are affected by numerous conditions indicative of blight, but any such difference would not, on this record, in which the bases for the agency findings have been extensively documented photographically and otherwise on a lot-by-lot basis, amount to more than another reasonable view of the matter; such a difference could not, consonant with what we have recognized to be the structural limitations upon our review of what is essentially a legislative prerogative, furnish a ground to afford petitioners relief" (*Matter of Goldstein v New York State Urban Dev. Corp.*, 13 NY3d 511, 526 [2009]).

Likewise, petitioners have not made a "clear showing" of bad faith (*Matter of Faith Temple Church v Town of Brighton*, 17 AD3d 1072, 1073 [2005]). While ESDC retained AKRF, Inc. to perform a blight study knowing that AKRF was performing consulting work for Columbia in relation to the project, any conflict of interest or bias was eliminated by ESDC's retention

of Earth Tech, Inc., an independent consultant with no ties to Columbia, to review and audit the AKRF study. Nor is there clear evidence that ESDC and Columbia colluded to manipulate the blight findings. Although they worked together in the planning process, the UDCA requires that a land use improvement project "afford[ ] maximum opportunity for participation by private enterprise" (Uncons Laws § 6260 [c] [3] [UDCA § 10 (c) (3)]). That Columbia will benefit from the project as well as the public is not a legally sufficient reason to invalidate ESDC's determinations (*see Matter of Waldo's, Inc. v Village of Johnson City*, 74 NY2d 718, 721 [1989], *affg* 141 AD2d 194 [1988]).

Because petitioners were given notice of the public hearing and the opportunity to be heard and to submit documents, I reject petitioners' contention that they were denied due process or a reasonable opportunity to be heard under EDPL 203 (*see Matter of Waldo's, Inc.*, 141 AD2d at 199; *First Broadcasting Corp. v City of Syracuse*, 78 AD2d 490, 495 [1981], *appeal dismissed* 53 NY2d 939 [1981]). Nor were petitioners' due process rights violated when ESDC denied some of their FOIL requests and closed the record prior to the resolution of the FOIL litigation (*see generally Lawrence v Baxter*, 2004 WL 1941347, *3, 2004 US Dist LEXIS 18022, *8-10 [WD NY 2004], *affd* 139 Fed Appx 365 [2d Cir 2005]). Contrary to petitioners' assertion, the EDPL procedures for challenging the agency's determinations satisfy the requirements of due process (*see Brody v Village of Port Chester*, 434 F3d 121, 132-133 [2d Cir 2005]). As to the FOIL requests, I note that petitioners received over 8,000 pages of documents from ESDC.

With respect to the closing of the record, petitioners fail to explain why they failed to bring a motion to vacate the automatic stay (CPLR 5519 [a]) imposed upon respondent's appeal from our order directing that additional documents be turned over by it (54 AD3d 154 [2008], *lv granted sub nom. Matter of West Harlem Bus. Group v Empire State Dev. Corp.*, 12 NY3d 708 [2009]). A CPLR 5519 (c) application would have afforded the Court with the opportunity to assess whether petitioners could demonstrate the likelihood of success on the merits of their position that the withheld documents fall outside the deliberative materials exemption applicable to disclosure under the Freedom of Information Law (*see Matter of Xerox Corp. v Town of Webster*, 65 NY2d 131 [1985]) and that such documents were material to ESDC's determination and, thus, essential to affording petitioners procedural due process. A year

has now elapsed since the record of the administrative proceeding was closed, and even at this late juncture, petitioners have not made any showing as to the materiality of documents directed to be produced under this Court's order; nor have petitioners set forth what the documents assertedly being withheld in contravention of our order might be expected to reveal. Furthermore, even if such materials are ultimately found by the Court of Appeals to be subject to disclosure under FOIL, there is simply no order concerning a stay of proceedings that is brought up for review (CPLR 5501 [a] [1]). Petitioners' intimation that the administrative determination should have been delayed while the FOIL litigation was completed is without factual or procedural foundation.

The record establishes that ESDC took the requisite hard look at the relevant areas of environmental concern, including the impact of the project's below-grade facility, particularly with respect to flooding issues (*see Matter of Jackson*, 67 NY2d at 417).

Accordingly, the determination of respondent New York State Urban Development Corporation should be confirmed.

NARDELLI, J., concurs with CATTERSON, J.; RICHTER, J., concurs in a separate opinion; TOM, J.P., and RENWICK, J., dissent in a separate opinion by TOM, J.P.

Petitions brought in this Court pursuant to Eminent Domain Procedure Law § 207, challenging the determination of respondent New York State Urban Development Corporation, doing business as Empire State Development Corporation, dated December 18, 2008, granted, and the determination annulled.