[933 NE2d 721, 907 NYS2d 122]

In the Matter of PARMINDER KAUR et al., Respondents, v NEW YORK STATE URBAN DEVELOPMENT CORPORATION, Doing Business as EMPIRE STATE DEVELOPMENT CORPORATION, Appellant.

In the Matter of TUCK-IT-AWAY, INC., et al., Respondents, v NEW YORK STATE URBAN DEVELOPMENT CORPORATION, Doing Business as EMPIRE STATE DEVELOPMENT CORPORATION, Appellant.

Argued June 1, 2010; decided June 24, 2010

**POINTS OF COUNSEL**

*Carter Ledyard & Milburn LLP*, New York City (*John R. Casolaro, Joseph M. Ryan, Susan B. Kalib* and *Theodore Y. McDonough* of counsel), *Sive, Paget & Riesel, P.C.* (*Mark A. Chertok* and *Dan Chorost* of counsel), and *Bryan Cave LLP* (*Philip E. Karmel* of counsel) for appellant. I. The project qualifies as a land use improvement project under the New York State Urban Development Corporation Act. (*Matter of Goldstein v New York State Urban Dev. Corp.*, 13 NY3d 511; *Zuckerman v City of New York*, 49 NY2d 557; *Matter of Develop Don't Destroy [Brooklyn]*

*v Urban Dev. Corp.*, 59 AD3d 312; *Aldrich v Pattison*, 107 AD2d 258; *Yonkers Community Dev. Agency v Morris*, 37 NY2d 478; *Jo & Wo Realty Corp. v City of New York*, 157 AD2d 205, 76 NY2d 962; *In re G. & A. Books, Inc.*, 770 F2d 288; *Matter of Haberman v City of Long Beach*, 307 AD2d 313; *Sunrise Props. v Jamestown Urban Renewal Agency*, 206 AD2d 913; *Natural Resources Defense Council, Inc. v City of New York*, 672 F2d 292.) II. The project qualifies as a civic project and will serve a public purpose. (*Russell Motor Car Co. v United States*, 261 US 514; *Garcia v United States*, 469 US 70; *Matter of Settco, LLC v New York State Urban Dev. Corp.*, 305 AD2d 1026; *Brooklyn Bridge Park Legal Defense Fund, Inc. v New York State Urban Dev. Corp.*, 14 Misc 3d 515, 50 AD3d 1029; *Matter of Develop Don't Destroy [Brooklyn] v Urban Dev. Corp.*, 59 AD3d 312; *Cornell Univ. v Bagnardi*, 68 NY2d 583; *Trustees of Union Coll. in Town of Schenectady in State of N.Y. v Members of Schenectady City Council*, 91 NY2d 161; *Cochran v Louisiana Bd. of Ed.*, 281 US 370; *Adair v Nashville Hous. Auth.*, 388 F Supp 481, *affd sub nom. Gardner v Nashville Hous. Auth. of Metro. Govt. of Nashville & Davidson County, Tenn.*, 514 F2d 38, 423 US 928.) III. *Kelo v New London* (545 US 469 [2005]) is irrelevant to this proceeding because "economic development" is not the primary public purpose in this case. IV. The Appellate Division erred in holding that petitioners were deprived of procedural due process. (*Matter of Leichter v New York State Urban Dev. Corp.*, 154 AD2d 258; *Mathews v Eldridge*, 424 US 319; *Armstrong v Manzo*, 380 US 545; *Matter of Waldo's, Inc. v Village of Johnson City*, 74 NY2d 718; *Village Auto Body Works v Incorporated Vil. of Westbury*, 90 AD2d 502; *Goldstein v Pataki*, 488 F Supp 2d 254, 516 F3d 50; *Brody v Village of Port Chester*, 434 F3d 121; *Matter of De Vito v City of Troy*, 72 AD2d 866; *First Broadcasting Corp. v City of Syracuse*, 78 AD2d 490; *Adams v United States*, 673 F Supp 1249.) V. Empire State Development Corporation complied with the State Environmental Quality Review Act.

*Norman Siegel*, New York City, *Philip Van Buren, McLaughlin & Stern, LLP* (*Steven J. Hyman* and *Aimee Saginaw* of counsel), and *Smith & Nesoff, PLLC* (*David L. Smith* of counsel), for respondents. I. Empire State Development Corporation's finding of blight was made in bad faith. (*Matter of Goldstein v New York State Urban Dev. Corp.*, 13 NY3d 511; *Matter of Dowling Coll. v Flacke*, 78 AD2d 551; *Saso v State of New York*, 20 Misc 2d 826; *Yonkers Community Dev. Agency v Morris*, 37 NY2d 478; *Kaskel v Impellitteri*, 306 NY 73; *Matter*

of *Ranauro v Town of Owasco*, 289 AD2d 1089; *Matter of Faith Temple Church v Town of Brighton*, 17 AD3d 1072; *Matter of West Harlem Bus. Group v Empire State Dev. Corp.*, 13 NY3d 882.) II. Empire State Development Corporation's finding of blight was palpably unreasonable and without basis in law or fact. (*Matter of Goldstein v New York State Urban Dev. Corp.*, 13 NY3d 511; *Kaskel v Impellitteri*, 306 NY 73; *Matter of Fresh Meadows Assoc. v New York City Conciliation & Appeals Bd.*, 92 Misc 2d 519; *Matter of Allen v Commissioner of Social Servs. of State of N.Y.*, 116 AD2d 35; *Matter of County of Orange v Village of Kiryas Joel*, 44 AD3d 765; *Matter of Dowling Coll. v Flacke*, 78 AD2d 551; *Yonkers Community Dev. Agency v Morris*, 37 NY2d 478; *Matter of Horoshko*, 90 AD2d 850.) III. The Columbia University project is not a "civic project" and the purported "civic purposes" are both legally insufficient to support the taking and constitute further pretext for dominant private purposes. (*Schulman v People*, 10 NY2d 249; *People v Cooney*, 194 Misc 668; *Brooklyn Bridge Park Legal Defense Fund, Inc. v New York State Urban Dev. Corp.*, 14 Misc 3d 515, 50 AD3d 1029; *Matter of Settco, LLC v New York State Urban Dev. Corp.*, 305 AD2d 1026; *Matter of Develop Don't Destroy [Brooklyn] v Urban Dev. Corp.*, 59 AD3d 312; *Murphy v Erie County*, 28 NY2d 80; *Strassman v State of New York*, 6 AD2d 962; *Bronx Household of Faith v Board of Educ. of City of N.Y.*, 492 F3d 89; *Yonkers Community Dev. Agency v Morris*, 37 NY2d 478; *Berman v Parker*, 348 US 26.) IV. Respondent-appellant violated petitioners-respondents' due process and statutory rights to be heard by closing the administrative record while withholding information to which petitioners-respondents had a legal right under the Freedom of Information Law. (*Mathews v Eldridge*, 424 US 319; *Matter of Zaccaro v Cahill*, 100 NY2d 884; *Rao v Gunn*, 73 NY2d 759; *Matter of Goohya v Walsh-Tozer*, 292 AD2d 384; *Matter of Simpson v Wolansky*, 38 NY2d 391; *Matter of Waldo's, Inc. v Village of Johnson City*, 141 AD2d 194; *Brody v Village of Port Chester*, 434 F3d 121; *Matter of West Harlem Bus. Group v Empire State Dev. Corp.*, 13 NY3d 882.) V. Empire State Development Corporation's proposed taking is unconstitutional because the Columbia University project did not ensue from a "carefully considered plan." (*Kelo v New London*, 545 US 469; *Matter of Fisher [New York State Urban Dev. Corp.]*, 287 AD2d 262; *Horton v California*, 496 US 128.) VI. The term "substandard and insanitary" in the New York State Development Corporation Act is unconstitutionally vague as applied and on its face. (*Montgomery v Daniels*, 38 NY2d 41; *Giaccio v*

*Pennsylvania,* 382 US 399; *Foss v City of Rochester,* 65 NY2d 247; *People v Stuart,* 100 NY2d 412; *People v New York Trap Rock Corp.,* 57 NY2d 371; *Lambert v California,* 355 US 225; *Kelo v New London,* 545 US 469; *People v Illardo,* 48 NY2d 408; *Papachristou v Jacksonville,* 405 US 156; *Yonkers Community Dev. Agency v Morris,* 37 NY2d 478.)

*Institute for Justice (Dana Berliner,* of the Virginia bar, admitted pro hac vice, *Robert J. McNamara,* of the Virginia bar, admitted pro hac vice, *Scott Bullock,* of the Virginia bar, admitted pro hac vice, and *Darpana M. Sheth* of counsel) for Institute for Justice, amicus curiae. I. Property owners are entitled to a meaningful opportunity to be heard before being stripped of their rights. (*Armstrong v Manzo,* 380 US 545; *Matter of Waldo's, Inc. v Village of Johnson City,* 141 AD2d 194; *Matter of Jackson v New York State Urban Dev. Corp.,* 67 NY2d 400; *Village Auto Body Works v Incorporated Vil. of Westbury,* 90 AD2d 502; *Brody v Village of Port Chester,* 434 F3d 121; *Hargett v Town of Ticonderoga,* 13 NY3d 325; *Kelo v New London,* 545 US 469.) II. This case presents a textbook example of a pretextual taking in violation of the public use requirement. (*Kelo v New London,* 545 US 469; *Hawaii Housing Authority v Midkiff,* 467 US 229; *99 Cents Only Stores v Lancaster Redevelopment Agency,* 237 F Supp 2d 1123; *Armendariz v Penman,* 75 F3d 1311; *Shanks v Dressel,* 540 F3d 1082.)

*Jane E. Booth, General Counsel, Columbia University,* New York City, *Wilmer Cutler Pickering Hale and Dorr LLP (Paul A. Engelmayer* of counsel), *Wilmer Cutler Pickering Hale and Dorr LLP (Seth P. Waxman,* of the District of Columbia bar, admitted pro hac vice, *Paul R.Q. Wolfson,* of the District of Columbia bar, admitted pro hac vice, *Rachel Z. Stutz,* of the District of Columbia bar, admitted pro hac vice, *Micah S. Myers,* of the District of Columbia bar, admitted pro hac vice, and *Sue-Yun Ahn* of counsel) for Columbia University, amicus curiae. I. The project is a civic project serving a public use, benefit and purpose because it is intended to provide facilities for educational and other public purposes. (*Cornell Univ. v Bagnardi,* 68 NY2d 583; *Matter of Gyrodyne Co. of Am., Inc. v State Univ. of N.Y. at Stony Brook,* 17 AD3d 675; *Matter of Develop Don't Destroy [Brooklyn] v Urban Dev. Corp.,* 59 AD3d 312, 13 NY3d 713; *Matter of Fisher [New York State Urban Dev. Corp.],* 287 AD2d 262; *Matter of West 41st St. Realty v New York State Urban Dev. Corp.,* 298 AD2d 1; *Matter of New York City Hous. Auth. v Muller,* 270 NY 333; *Fallbrook Irrigation Dist. v Bradley,* 164

US 112; *Kelo v New London*, 545 US 469; *Matter of Goldstein v New York State Urban Dev. Corp.*, 64 AD3d 168, 13 NY3d 511; *Matter of Waldo's, Inc. v Village of Johnson City*, 74 NY2d 718.) II. The project provides significant public benefits. (*Matter of 49 WB, LLC v Village of Haverstraw*, 44 AD3d 226; *Hargett v Town of Ticonderoga*, 13 NY3d 325.) III. Empire State Development Corporation's plan also qualifies as a public use under the Federal Constitution. (*Hawaii Housing Authority v Midkiff*, 467 US 229; *Goldstein v Pataki*, 516 F3d 50; *Kelo v New London*, 545 US 469; *Searl v School Dist. No. 2 in Lake Cty.*, 133 US 553; *United States v 14.02 Acres of Land More or Less in Fresno County*, 547 F3d 943; *Cochran v Louisiana Bd. of Ed.*, 281 US 370; *Cornell Univ. v Bagnardi*, 68 NY2d 583.)

*Feerick Lynch MacCartney PLLC*, South Nyack (*J. David MacCartney, Jr.*, of counsel), and *Goldstein, Rikon & Rikon, P.C.*, New York City, for East Harlem Alliance of Responsible Merchants, amicus curiae. I. The court should hold that condemnor's claims of "blight" may not prevail when the record points to bad faith, irrationality and corruption. (*People v Artusa*, 12 Misc 3d 1196[A], 2006 NY Slip Op 51594[U]; *Kaskel v Impellitteri*, 306 NY 73; *Yonkers Community Dev. Agency v Morris*, 37 NY2d 478, 423 US 1010; *Matter of Goldstein v New York State Urban Dev. Corp.*, 13 NY3d 511; *Nixon v Shrink Missouri Government PAC*, 528 US 377; *Molinari v Powers*, 82 F Supp 2d 57; *Kelo v New London*, 545 US 469.) II. The court should reject respondent-appellant's attempt to twist *Matter of Goldstein v New York State Urban Dev. Corp.* (13 NY3d 511 [2009]) into a declaration of judicial impotence and abdication. (*Kelo v New London*, 545 US 469; *Calder v Bull*, 3 Dallas [3 US] 386; *Matter of Hopper v Britt*, 203 NY 144; *Yonkers Community Dev. Agency v Morris*, 37 NY2d 478, 423 US 1010; *Matter of 49 WB, LLC v Village of Haverstraw*, 44 AD3d 226; *Matter of Dowling Coll. v Flacke*, 78 AD2d 551; *Cuglar v Power Auth. of State of N. Y.*, 4 Misc 2d 879, 4 AD2d 801, 3 NY2d 1006; *Matter of Woodfield Equities LLC v Incorporated Vil. of Patchogue*, 28 AD3d 488; *Courtesy Sandwich Shop v Port of N.Y. Auth.*, 17 AD2d 590, 12 NY2d 379, 375 US 78, 960; *Denihan Enters. v O'Dwyer*, 302 NY 451.) III. This Court should hold that private property may not be taken except for a public use. (*Chicago, B. & Q. R. Co. v Chicago*, 166 US 226; *Kelo v New London*, 545 US 469; *Wright v United States*, 302 US 583; *Matter of New York City Hous. Auth. v Muller*, 270 NY 333; *Courtesy Sandwich Shop v Port of N.Y. Auth.*, 12 NY2d 379; *Brown v Legal Foundation of Wash.*, 538 US 216; *Matter of Goldstein v New York State*

*Urban Dev. Corp.*, 13 NY3d 511; *Brody v Village of Port Chester*, 434 F3d 121; *Matter of Syracuse Univ. v Project Orange Assoc. Servs. Corp.*, 71 AD3d 1432; *Matter of West Harlem Bus. Group v Empire State Dev. Corp.*, 13 NY3d 882.)

*Michael A. Cardozo, Corporation Counsel*, New York City (*Leonard Koerner, Paul T. Rephen* and *Rochelle H. Cohen* of counsel), for City of New York, amicus curiae. I. Empire State Development Corporation's finding of blight is rational and amply supported by the record and is entitled to deference. (*Yonkers Community Dev. Agency v Morris*, 37 NY2d 478; *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400; *Kaskel v Impellitteri*, 306 NY 73; *Akpan v Koch*, 75 NY2d 561; *Matter of Develop Don't Destroy [Brooklyn] v Urban Dev. Corp.*, 59 AD3d 312, 13 NY3d 713; *Matter of Goldstein v New York State Urban Dev. Corp.*, 64 AD3d 168, 13 NY3d 511; *Matter of Waldo's, Inc. v Village of Johnson City*, 74 NY2d 718; *Matter of West 41st St. Realty v New York State Urban Dev. Corp.*, 298 AD2d 1; *Goldstein v Pataki*, 516 F3d 50; *Kelo v New London*, 545 US 469.) II. The project qualifies as a civic project under the New York State Urban Development Corporation Act. (*Matter of Develop Don't Destroy [Brooklyn] v Urban Dev. Corp.*, 59 AD3d 312; *Matter of Schachner v Perales*, 203 AD2d 21; *People v Illardo*, 48 NY2d 408.) III. Petitioners' due process rights were not violated. (*Matter of Waldo's, Inc. v Village of Johnson City*, 141 AD2d 194, 74 NY2d 718; *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400.)

*Denise Outram*, New York City, for Bill Perkins, amicus curiae. I. The existence of a "public use" is a constitutional issue that is ultimately a matter for the courts and the plurality correctly reviewed the record for evidence of pretext and bad faith. (*Denihan Enters. v O'Dwyer*, 302 NY 451; *Campaign for Fiscal Equity, Inc. v State of New York*, 8 NY3d 14; *Marbury v Madison*, 1 Cranch [5 US] 137; *Kelo v New London*, 545 US 469; *Matter of Goldstein v New York State Urban Dev. Corp.*, 13 NY3d 511.) II. The definition of "substandard and insanitary" in the New York State Urban Development Corporation Act is unconstitutionally vague on its face and as applied. (*Matter of Goldstein v New York State Urban Dev. Corp.*, 13 NY3d 511; *Berman v Parker*, 348 US 26; *Miller v California*, 413 US 15.) III. The burdens of blight and economic development condemnations have and will continue to fall disproportionately upon racial and ethnic minorities and the economically disadvantaged. (*Kelo v New London*, 545 US 469; *United States v Carolene*

*Products Co.,* 304 US 144; *Berman v Parker,* 348 US 26.) IV. The determination and findings should be rejected because Empire State Development Corporation denied petitioners their right to due process by closing the record while withholding documents which were ordered to be released. (*Matter of Fink v Lefkowitz,* 47 NY2d 567.)

*Ben Totushek,* amicus curiae pro se. I. Columbia University has consistently acted against public opinion and withheld project information relevant to Empire State Development Corporation proceedings from the general public. II. Columbia University's current and past educational uses do not constitute a public or civic educational use and there is no basis to consider that future uses will do so. (*Kelo v New London,* 545 US 469.)

### OPINION OF THE COURT

CIPARICK, J.

In this appeal, we are called upon to determine whether respondent's exercise of its power of eminent domain to acquire petitioners' property for the development of a new Columbia University campus was supported by a sufficient public use, benefit or purpose (*see* NY Const, art I, § 7 [a]; EDPL 207 [C] [4]). We answer this question in the affirmative and conclude, pursuant to our recent holding in *Matter of Goldstein v New York State Urban Dev. Corp.* (13 NY3d 511 [2009]), that the Empire State Development Corporation's (ESDC) findings of blight and determination that the condemnation of petitioners' property qualified as a "land use improvement project" were rationally based and entitled to deference. We also conclude that the alternative finding of "civic purpose," likewise, had a rational basis.

### I.

Petitioners in this proceeding are the owners of different commercial establishments located in the West Harlem neighborhood of Manhattan. Petitioners Parminder Kaur and Amanjit Kaur own a gasoline service station located on West 125th Street. Petitioners Tuck-It-Away, Inc., Tuck-It-Away Bridgeport, Inc., Tuck-It-Away at 133rd Street, Inc., and Tuck-It-Away Associates, L.P. (collectively TIA) own storage facilities located on Broadway and on West 131st and West 125th Streets. Petitioner P.G. Singh Enterprises, LLP also owns a gasoline service station located on West 125th Street.

On December 18, 2008, respondent ESDC issued a determination pursuant to EDPL 204, concluding that it should use its

power of condemnation to purchase 17 acres of privately owned property, including petitioners', in connection with the Columbia University Educational Mixed Use Development Land Use Improvement and Civic Project (the Project). Located in the Manhattanville section of West Harlem, the Project site will extend from the south side of West 125th Street to the north side of West 133rd Street and will be bounded by Broadway and Old Broadway on the east and 12th Avenue on the west. The majority of the buildings located within the proposed Project site are commercial and it is undisputed that petitioners' property is among the property that ESDC is seeking to acquire.[1]

The Project contemplates the construction of a new urban campus that would consist of 16 new state-of-the-art buildings, the adaptive reuse of an existing building and a multi-level below-grade support space. Approximating 6.8 million gross square feet in size, the Project provides for the creation of about two acres of publicly accessible open space, a retail market along 12th Avenue and widened, tree-lined sidewalks. The new buildings will house, among other things, teaching facilities, academic research centers, graduate student and faculty housing as well as an area devoted to services for the local community. Columbia University, a not-for-profit educational corporation, will exclusively underwrite the cost of this Project and not seek financial assistance from the government.[2]

The origins of the Project trace back to 2001 when Columbia first approached the New York City Economic Development Corporation (EDC) to redevelop the West Harlem area. Following Columbia's interest in revitalizing the neighborhood and expanding its campus, EDC commenced a general economic study of the neighborhood. It issued its report, the West Harlem Master Plan (the Plan), in August 2002, which outlined a series of strategies for the economic development of the region that would encompass three stages.[3] To effectuate these stated goals, the Plan envisioned changes in zoning that would foster job

---

1. There are seven residential buildings located within the Project site. According to ESDC, it "will not exercise its eminent domain power to acquire these seven buildings at any time while they remain occupied by residential occupants."

2. In 2007, Columbia estimated the cost of the Project at $6.28 billion.

3. The Plan's proposal provided for the development of West Harlem's waterfront (stage 1), improvements to both the streetscape and the public transportation system including increased access to the neighborhood (stage 2) and neighborhood economic development with the articulated goal of creating new jobs (stage 3).

growth, shopping opportunities and the general enlivening of street life. Significantly, the Plan recognized that

> "[n]eighboring institutions such as Columbia's Morningside Heights campus, the main campus of City College, and the Columbia Presbyterian Medical Center can be key catalysts in the economic development of West Harlem. Not only can these institutions provide the day-to-day presence that will enliven the area as a regional attraction, they can also act as partners in job creation."

In 2003, EDC hired Urbitran Associates (Urbitran), an engineering, architecture and planning firm, to conduct a separate study, examining the neighborhood conditions of West Harlem. Urbitran documented and photographed the area of the Project site as well as the surrounding area and focused its analysis on four major criteria: (1) signs of deterioration, (2) substandard or unsanitary conditions, (3) adequacy of infrastructure and (4) indications of the impairment of sound growth in the surrounding community. The study, issued by EDC in August 2004, determined that the conditions in the study area merited a designation of blight. Specifically, the study revealed that several of the buildings throughout West Harlem were dilapidated.[4] Urbitran also concluded that numerous buildings evidenced poor exterior conditions and structural degradation. According to this study, two of the blocks with the highest number of deficient buildings and lots are within the Project site.

Meanwhile, as Urbitran performed its neighborhood conditions study of West Harlem, Columbia began to purchase property located within the Project site.[5] ESDC met with Columbia and EDC for the first time in March 2004 to discuss the proposed condemnation of petitioners' land. As the talks between ESDC, EDC and Columbia ensued, Columbia hired the environmental planning and consulting firm Allee King Rosen & Fleming (AKRF) to assist Columbia in seeking the necessary agency approval for the Project as well as to prepare the required environmental impact statement (EIS). On July 30, 2004, ESDC and Columbia entered into an agreement, which

---

    **4.** Dilapidated was defined by Urbitran as "significant evidence of aesthetic degradation (usually a combination of broken windows, peeling paint, and façade damage, among other things)."

    **5.** By October 2003, Columbia owned 51% of the properties in the Project area.

provided that Columbia would pay ESDC's costs associated with the Project.

In September 2006, notwithstanding the results of the Urbitran study, ESDC retained AKRF to perform a neighborhood conditions report of the Project site on its behalf. ESDC chose AKRF, in part, because it was already familiar with the Project site. Moreover, ESDC had worked with AKRF before on other studies in connection with other condemnation proceedings.[6] In turn, AKRF hired Thornton Tomasetti, an engineering firm, to inspect and evaluate the physical conditions of the structures within the Project site.

AKRF photographed and conducted detailed inspections of each of the individual lots in the Project site. It documented structural conditions, vacancy rates, site utilization, property ownership, and crime data. For each building on the Project site, it also documented the physical and structural conditions, health and safety concerns, building code violations, underutilization, and environmental hazards. AKRF said it selected these factors "because they are generally accepted indicators of disinvestment in a neighborhood. The widespread presence of one or more of these factors can also demonstrate the need for revitalization and redevelopment of an area." Based on these factors, on November 1, 2007, AKRF issued its Manhattanville Neighborhood Conditions Study. This study concluded that the Project site was "substantially unsafe, unsanitary, substandard, and deteriorated" or, in short, blighted.

As ESDC prepared to issue its "blight study" of the Project site, Columbia moved towards obtaining the necessary agency approval to realize its expansion plan. Indeed, the public process for this Project was extensive and formally began when the New York City Planning Commission (CPC) first considered whether to authorize the rezoning of about 35 acres of West Harlem, including the 17-acre Project site. The rezoning of this area, recommended in EDC's West Harlem Master Plan, triggered a thorough review according to New York City's Uniform Land Use Review Procedure (ULURP).

Consequently, on November 16, 2007, CPC, pursuant to the New York State Environmental Quality Review Act (SEQRA) and the City Environmental Quality Review (CEQR) issued a

---

6. Most recently, in determining that the area in downtown Brooklyn, known as the Atlantic Yards, was blighted, ESDC relied upon an AKRF neighborhood conditions study (*see Matter of Goldstein*, 13 NY3d at 518).

notice of completion for the Project's final EIS (FEIS). The FEIS evaluated nine different plans for the Project site. Since none of the other plans provided for publicly accessible open spaces and community facilities, CPC determined that the proposed alternatives were less beneficial to the public than the rezoning based on Columbia's proposal.

Ten days after it issued the notice of completion, CPC released its findings on the FEIS. In its findings, CPC noted that Columbia "is of significant importance to the City and State as a center of educational excellence and a source of economic growth, and the Academic Mixed Use Development Plan is intended to fulfill these public purposes." Thus, CPC approved the rezoning that would allow Columbia to construct "a new urban campus" that will be "integrated with the urban grid, with all streets remaining open to the public . . . and a new open space network open to University-affiliated personnel and the general public alike." CPC further recognized that the proposed Project may require the use of eminent domain, which, if necessary, "would serve a public purpose insofar as it would allow for realization of the public benefits of the Columbia proposal." Following CPC's approval of the rezoning in West Harlem, the City Council held a public hearing on this matter and on December 19, 2007, it approved the 35-acre rezoning of West Harlem.

Meanwhile, certain business groups located within the Project site, including petitioner TIA, requested documents related to the Project on several occasions pursuant to the Freedom of Information Law (FOIL). In response, ESDC turned over about 8,000 pages of documents to petitioners. Petitioner TIA and the other business groups, however, believing that they were entitled to other documents not disclosed by ESDC, filed separate CPLR article 78 petitions.

Supreme Court, after an extensive in camera review of the documents in dispute, granted the applications of petitioner TIA and the other business groups and ordered, in relevant part, the release of certain documents in ESDC's possession, including documents related to its July 2004 agreement with Columbia as well as its correspondence with AKRF (*Matter of West Harlem Bus. Group v Empire State Dev. Corp.*, 2007 NY Slip Op 34369[U]); ESDC appealed the order of Supreme Court to the Appellate Division. On July 15, 2008, the Appellate Division affirmed the portion of Supreme Court's order requiring the disclosure of documents related to ESDC's agreement with Columbia as well as its communication with AKRF (*see Matter*

*of Tuck-It-Away Assoc., L.P. v Empire State Dev. Corp.*, 54 AD3d 154, 162 [1st Dept 2008]). In its ruling, the court called into question AKRF's "tangled relationships" with both ESDC and Columbia (*Matter of Tuck-It-Away Assoc., L.P.*, 54 AD3d at 166). Following the order of the Appellate Division, ESDC disclosed its correspondence with AKRF, but otherwise appealed the order of the Appellate Division to this Court.

It is important to note that the appeal brought before us late last year concerned the disclosure of just five documents (*see Matter of West Harlem Bus. Group v Empire State Dev. Corp.*, 13 NY3d 882, 884 [2009]). ESDC argued to us and the courts below that the July 2004 paperwork related to its agreement with Columbia was exempt from disclosure under Public Officers Law § 87 (2) (c) because disclosure "would impair present or imminent contract awards or collective bargaining negotiations." We concluded, however, that ESDC failed to meet its burden under FOIL of establishing that those documents were exempt from disclosure because it did not articulate a particularized reason for denying disclosure. Accordingly, we affirmed the order of the Appellate Division.

Because the courts below raised concerns about the propriety of ESDC's choice to hire AKRF to conduct a neighborhood conditions study of West Harlem, ESDC retained a second engineering and environmental consultant, Earth Tech, to separately assess the conditions of the Project site and issue an independent report. Earth Tech, which had no prior affiliation with Columbia, was specifically instructed not to provide any services to Columbia while it worked for ESDC.

Charged with the task of performing yet another "blight study" of the area, Earth Tech engineers independently photographed, inspected and assessed each of the lots on the Project site. In May 2008, Earth Tech issued its Manhattanville Neighborhood Conditions Study. In the study, Earth Tech noted certain variables including current land uses, structural conditions, health and safety issues, utilization rates, environmental contamination, building code violations and crime statistics. Earth Tech determined that since 1961, there was a dearth of new construction in the area, finding a "long-standing lack of investor interest in the neighborhood." Earth Tech also enumerated the extensive building code violations in the area and the chronic problems that the buildings had with water infiltration.

Earth Tech also found that many of the buildings in the Project site had deteriorated façades and that several of the

buildings had been sealed by the New York City Fire Department because of unsafe conditions. It also discovered widespread vermin on the streets and graffiti on the walls of the buildings and other structures. With respect to the four parcels owned by petitioner TIA, Earth Tech determined that these parcels, taken together, had more than three times the average number of building violations as the parcels acquired by Columbia over the previous several years.[7] In sum, Earth Tech concluded that the neighborhood conditions created "a blighted and discouraging impact on the surrounding community."

With the "blight studies" of both AKRF and Earth Tech in hand and with the knowledge that the City Council had approved the Project site for rezoning, on July 17, 2008, ESDC adopted a General Project Plan (GPP) that would enable Columbia to move forward with its plan to build an urban campus in West Harlem. Pursuant to EDPL 201 and 202, ESDC solicited public comment on the GPP, holding a duly noticed hearing on September 2 and 4, 2008. This hearing, which lasted over 13 hours, was attended by 98 members of the community, including petitioners and their counsel. The purpose of the hearing was to provide those interested with the opportunity to comment on the GPP and the public purpose of the Project. At the hearing, ESDC distributed copies of its adopted GPP as well as copies of the FEIS, and the AKRF and Earth Tech neighborhood conditions reports. These documents, made available to the public by ESDC in July 2008, along with the record of the two-day hearing, remained open for public inspection until October 30, 2008, the close of the comment period.

Petitioners, with access to all 8,000 or so documents that comprised the administrative record in this case (and turned over pursuant to FOIL requests), responded to the GPP adopted by ESDC. Indeed, petitioners submitted two legal memoranda and thousands of pages of materials in opposition to the Project during the comment period. ESDC, in turn, prepared a comprehensive 75-page document entitled "Response to Comments," which thoroughly addressed the concerns raised by petitioners and others.

Taking into consideration the questions raised by the petitioners during the hearing and their substantial written submis-

---

7. In one example, Earth Tech found that petitioner TIA unlawfully used its building located at 3300 Broadway as a parking garage in violation of zoning laws and its certificate of occupancy. As a result, in 2008, the building had to be evacuated in order to avoid imminent collapse.

sions that followed, on December 18, 2008, ESDC adopted a modified GPP and authorized the issuance of its findings and determination. ESDC sponsored the Project both as a "land use improvement project" pursuant to the New York State Urban Development Corporation Act (L 1968, ch 174, § 1, as amended [UDC Act]) (McKinney's Uncons Laws of NY § 6253 [6] [c] [UDC Act § 3 (6) (c)]) and as a "civic project" pursuant to a different paragraph of the same Act (Uncons Laws § 6253 [6] [d] [UDC Act § 3 (6) (d)]).

In so sponsoring this Project, ESDC specified the public uses, benefits and purposes of the Project pursuant to its obligations under EDPL 204 (B) (1). It found, for example, that the Project would address the city and statewide "need for educational, community, recreational, cultural and other civic facilities" and would enable New York City and the State to maintain their positions as "global center[s] for higher education and academic research." ESDC further determined that Manhattanville "suffer[ed] from long-term poor maintenance [and] lack of development and disinvestment" and the Project would help curb the "current bleak conditions [that] are and have been inhibiting growth and preventing the site's integration into the surrounding community."

In eliminating the blighted conditions plaguing the area of the Project site, ESDC noted that the Project would create 14,000 jobs during the construction of the new campus as well as 6,000 permanent jobs following the Project's completion. ESDC found that the Project would generate substantial revenue, estimating that "tax revenue derived from construction expenditures and total personal income during this period" at $122 million for the State and $87 million for New York City.

Moreover, ESDC indicated that another purpose of the Project was the creation of much needed public space. Specifically, it found that the Project site would create "approximately 94,000 square feet of accessible open space and maintained as such in perpetuity that will be punctuated by trees, open vistas, paths, landscaping and street furniture and an additional well-lit 28,000 square feet of space of widened sidewalks that will invite east-west pedestrian traffic."

In addition to the open space created, ESDC highlighted that the Project made provision for infrastructure improvements—most notably to the 125th Street subway station—as well as substantial financial commitment by Columbia to the

maintenance of West Harlem Piers Park. ESDC further acknowledged that Columbia would open its facilities—including its libraries and computer centers—to students attending a new public school that Columbia is supplying the land to rent-free for 49 years. Columbia would also open its new swimming facilities to the public.

Nonetheless, on February 20, 2009, petitioners challenged ESDC's findings and determination in the Appellate Division pursuant to EDPL 207. A plurality of that court concluded that "ESDC's determination that the project has a public use, benefit or purpose is wholly unsupported by the record and precedent" (72 AD3d 1, 9 [1st Dept 2009]). One Justice, concurring in the result, opined that petitioners' "procedural due process and statutory rights were violated by ESDC's refusal to keep the record open until the conclusion of the FOIL litigation initiated by [petitioner] Tuck-It-Away" (*id.* at 28).

Two Justices of the court dissented. They concluded that "ESDC's finding that the project will serve a public purpose by providing, among other things, needed educational facilities in the area in which it is to be located is neither irrational nor baseless" and was entitled to deference (*id.* at 33). The dissenting Justices also rejected the argument that petitioners were denied procedural due process (*id.* at 35).

Respondent appealed as of right, pursuant to CPLR 5601 (a) and (b), and we now reverse.

## II.

Petitioners' main argument on this appeal is that the Project approved by ESDC is unconstitutional because the condemnation is not for the purpose of putting properties to "public use" within the meaning of article I, § 7 (a) of the NY Constitution, which provides that "[p]rivate property shall not be taken for public use without just compensation." First, petitioners vociferously contend that ESDC's blight findings were made in bad faith and the Project only serves the private interests of Columbia. ESDC counters that the duly approved Project qualifies as a "land use improvement project" within the meaning of the UDC Act and that the Appellate Division plurality erred as a matter of law when it conducted a de novo review of the administrative record and concluded that the Project site was not blighted. We agree with ESDC.

"[I]t is indisputable that the removal of urban blight

is a proper, and, indeed, constitutionally sanctioned, predicate for the exercise of the power of eminent domain. It has been deemed a 'public use' within the meaning of the State Constitution's Takings Clause at least since *Matter of New York City Hous. Auth. v Muller* (270 NY 333 [1936]) and is expressly recognized by the Constitution as a ground for condemnation" (*Matter of Goldstein*, 13 NY3d at 524).[8]

In *Matter of Goldstein*, we reaffirmed the long-standing doctrine that the role of the Judiciary is limited in reviewing findings of blight in eminent domain proceedings (*see id.* at 526). Because the determinations of blight and public purpose are the province of the Legislature, and are entitled to deference by the Judiciary, we stated that

"[w]hether a matter should be the subject of a public undertaking—whether its pursuit will serve a public purpose or use—is ordinarily the province of the Legislature, not the Judiciary, and the actual specification of the uses identified by the Legislature as public has been largely left to quasi-legislative administrative agencies. It is only where there is *no room for reasonable difference of opinion* as to whether an area is blighted, that judges may substitute their views as to the adequacy with which the public purpose of blight removal has been made out for that of the legislatively designated agencies" (*id.* [emphasis added]).

Indeed, we observed that "[t]he Constitution accords government broad power to take and clear substandard and insanitary areas for redevelopment. In so doing, it commensurately deprives the Judiciary of grounds to interfere with the exercise" (*id.* at 527). These principles are based on a consistent body of law that goes back over 50 years (*see e.g. Yonkers Community Dev. Agency v Morris*, 37 NY2d 478, 484 [1975] ["extensive authority to make the initial determination that an area qualifies for renewal as 'blighted' has been vested in the agencies and the municipalities; courts may review their findings only upon a limited basis"]; *see also Matter of Jackson v New York*

---

**8.** Article XVIII, § 1 of the NY Constitution authorizes the Legislature to "provide in such manner, by such means and upon such terms and conditions as it may prescribe . . . for the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas."

*State Urban Dev. Corp.*, 67 NY2d 400, 425 [1986]; *Kaskel v Impellitteri*, 306 NY 73, 78 [1953], *cert denied* 347 US 934 [1954]). Thus, a court may only substitute its own judgment for that of the legislative body authorizing the project when such judgment is irrational or baseless (*see Matter of Goldstein*, 13 NY3d at 527).

Applying this standard of review, as we must, we now look to the relevant statute. The UDC Act provides that, in the case of land use improvement projects, ESDC must find:

> "(1) That the area in which the project is to be located is a substandard or insanitary area, or is in danger of becoming a substandard or insanitary area and tends to impair or arrest the sound growth and development of the municipality;

> "(2) That the project consists of a plan or undertaking for the clearance, replanning, reconstruction and rehabilitation of such area and for recreational and other facilities incidental or appurtenant thereto;

> "(3) That the plan or undertaking affords maximum opportunity for participation by private enterprise, consistent with the sound needs of the municipality as a whole" (Uncons Laws § 6260 [c] [UDC Act § 10 (c)]).

The term "substandard or insanitary area" is defined as "a slum, blighted, deteriorated or deteriorating area, or an area which has a blighting influence on the surrounding area" (Uncons Laws § 6253 [12] [UDC Act § 3 (12)]). Here, the two reports prepared by ESDC consultants—consisting of a voluminous compilation of documents and photographs of property conditions—arrive at the conclusion that the area of the Project site is blighted. Just as in *Matter of Goldstein*, "all that is at issue is a reasonable difference of opinion as to whether the area in question is in fact substandard and insanitary," which is "not a sufficient predicate . . . to supplant [ESDC's] determination" (13 NY3d at 528).

Thus, given our precedent, the de novo review of the record undertaken by the plurality of the Appellate Division was improper. On the "record upon which the ESDC determination was based and by which we are bound" (*id.* at 517, citing *Matter of Levine v New York State Liq. Auth.*, 23 NY2d 863, 864 [1969]), it cannot be said that ESDC's finding of blight was

irrational or baseless. Indeed, ESDC considered a wide range of factors including the physical, economic, engineering and environmental conditions at the Project site. Its decision was not based on any one of these factors, but on the Project site conditions as a whole. Accordingly, since there is record support—"extensively documented photographically and otherwise on a lot-by-lot basis" (*id.* at 526)—for ESDC's determination that the Project site was blighted, the Appellate Division plurality erred when it substituted its view for that of the legislatively designated agency.

## III.

■ Despite the objective data utilized by ESDC in its finding of blight, petitioners conclusorily assert that ESDC acted in "bad faith" and with pretext when it arrived at its determination (*see generally Matter of Jackson,* 67 NY2d at 425; *Kaskel,* 306 NY at 79). Petitioners and the plurality at the Appellate Division particularly take umbrage at ESDC's decision to hire AKRF to conduct a neighborhood conditions study because Columbia had previously engaged AKRF to prepare its EIS. Here, the record does not support petitioners' contention that the study conducted by AKRF was compromised simply because it separately prepared an EIS on behalf of Columbia.

Moreover, ESDC—as a measure of caution and in response to criticism of its choice to retain AKRF—hired a second consulting firm, Earth Tech, to conduct review of the Project site. This company arrived at conclusions similar to AKRF's. Contrary to petitioners' assertions, Earth Tech did not merely review and rubber-stamp AKRF's study, but conducted its own independent research and gathered separate data and photographs of the area before arriving at its own conclusions. Further, unlike AKRF, Earth Tech had never previously been affiliated with or employed by Columbia. Simply put, petitioners' argument that ESDC acted in "bad faith" or pretextually is unsubstantiated by the record.

## IV.

■ In addition to attacking the neighborhood blight studies and ESDC's determination based on those studies, petitioners also challenge the constitutionality of the statutory term "substandard or insanitary area" (*see* Uncons Laws § 6253 [12]; § 6260 [c] [1] [UDC Act § 3 (12); § 10 (c) (1)]). They argue that we should find this term void for vagueness. This contention is likewise unpersuasive.

It has long been settled that "civil as well as penal statutes can be tested for vagueness under the due process clause" (*Montgomery v Daniels*, 38 NY2d 41, 58 [1975], citing *Giaccio v Pennsylvania*, 382 US 399, 402 [1966]). Due process requires that a statute be sufficiently definite "so that individuals of ordinary intelligence are not forced to guess at the meaning of statutory terms" (*Foss v City of Rochester*, 65 NY2d 247, 253 [1985]; *see also People v Stuart*, 100 NY2d 412, 420 [2003]). In the context of eminent domain cases, we have held that, to guard against discriminatory application of the law, it is not necessary that "the degree of deterioration or precise percentage of obsolescence or mathematical measurement of other factors be arrived at with precision" (*Yonkers Community Dev. Agency*, 37 NY2d at 484).

Indeed, in *Yonkers Community Dev. Agency*, we recognized that "[m]any factors and interrelationships of factors may be significant" for a blight finding and

> "may include such diverse matters as irregularity of
> the plots, inadequacy of the streets, diversity of land
> ownership making assemblage of property difficult,
> incompatibility of the existing mixture of residential
> and industrial property, overcrowding, the incidence
> of crime, lack of sanitation, the drain an area makes
> on municipal services, fire hazards, traffic conges-
> tion, and pollution" (*id.* at 483).

Not only this Court, but the Supreme Court has consistently held that blight is an elastic concept that does not call for an inflexible, one-size-fits-all definition (*see Berman v Parker*, 348 US 26, 33-34 [1954]). Rather, blight or "substandard or insanitary areas," as we held in *Matter of Goldstein* and *Yonkers Community Dev. Agency*, must be viewed on a case-by-case basis. Accordingly, because the UDC Act provides adequate meaning to the term "substandard or insanitary area," we reject petitioners' argument that the statute is unconstitutionally vague on its face.

## V.

On appeal to the Appellate Division, petitioners argued that there were no findings of blight in the Project site prior to Columbia's acquisition of property there. Despite the objective data in the record to the contrary, the Appellate Division plurality agreed stating that there was "no evidence whatsoever that Manhattanville was blighted prior to Columbia gaining control

over the vast majority of property therein" (72 AD3d at 16). This argument is unsupported by the record.

In determining that Columbia created the blighted conditions in West Harlem, the plurality of the Appellate Division disregarded the Urbitran blight study commenced in 2003. That study, made at EDC's request and not ESDC's, was based on a survey of the Project site and surrounding neighborhood at a time when Columbia was only beginning to purchase property in the area. Indeed, the Urbitran study unequivocally concluded that there was "ample evidence of deterioration of the building stock in the study area" and that "[s]ubstandard and unsanitary conditions were detected in the study area." Moreover, Earth Tech found that, since 1961, the neighborhood has suffered from a long-standing lack of investment interest. Thus, since there is record support that the Project site was blighted before Columbia began to acquire property in the area, the issue is beyond our further review.

## VI.

■ We also conclude that ESDC properly qualified this Project, in the alternative, as a "civic project" within the meaning of the UDC Act. Of course, ESDC is statutorily empowered to exercise eminent domain in furtherance of a civic project regardless of whether a project site suffers from blight. A civic project is defined as "[a] project or that portion of a multi-purpose project designed and intended for the purpose of providing facilities for *educational*, cultural, recreational, community, municipal, public service or other civic purposes" (Uncons Laws § 6253 [6] [d] [UDC Act § 3 (6) (d)] [emphasis added]). Moreover, under the UDC Act, ESDC is "empowered to undertake the acquisition, construction, reconstruction, rehabilitation or improvement of a [civic] project" if it finds:

> "(1) That there exists in the area in which the project is to be located, a need for the *educational*, cultural, recreational, community, municipal, public service or other civic facility to be included in the project;
>
> "(2) That the project shall consist of a building or buildings or other facilities which are suitable for *educational*, cultural, recreational, community, municipal, public service or other civic purposes" (Uncons Laws § 6260 [d] [UDC Act § 10 (d)] [emphasis added]).

The plurality at the Appellate Division held that the expansion of a private university does not qualify as a "civic purpose." This conclusion does not have statutory support. Indeed, there is nothing in the statutory language limiting a proposed educational project to public educational institutions. In fact, the UDC Act encourages participation in projects by private entities (*see* Uncons Laws § 6252 [UDC Act § 2] ["(i)t is further declared to be the policy of the state to promote . . . sound growth and development of our municipalities through . . . redevelopment . . . of (blighted) areas (and) . . . the undertaking of public and *private improvement programs* related thereto, including the provision of educational, recreational and cultural facilities, and the encouragement of participation in these programs by *private enterprise*" (emphasis added)]; *see also* Uncons Laws § 6260 [c] [3] [UDC Act § 10 (c) (3)]). Thus, there is no reason to depart from the plain meaning of the word "education" by limiting the term to public institutions.

Moreover, consonant with the policy articulated in the UDC Act, ESDC has a history of participation in civic projects involving private entities. The most recent example of a civic project is the Atlantic Yards project, which authorized a private entity to construct and operate an arena for the Nets professional basketball franchise (*see Matter of Develop Don't Destroy [Brooklyn] v Urban Dev. Corp.*, 59 AD3d 312 [1st Dept 2009], *lv denied* 13 NY3d 713 [2009]). The petitioners in that case argued that the project did not qualify as a "civic project" because the arena would be used by a professional basketball team and operated by a private profit-making entity. In rejecting that argument, the Appellate Division explained "that a sports arena, even one privately operated for profit, may serve a public purpose" (*id.* at 325). Looking to the plain language of section 10 (d) of the UDC Act (*see* Uncons Laws § 6260 [d]), the court observed that "the proposed arena will serve a public purpose by providing a needed recreational venue in the area of the project" (*id.*).

The proposed Project here is at least as compelling in its civic dimension as the private development in *Matter of Develop Don't Destroy (Brooklyn)*. Unlike the Nets basketball franchise, Columbia University, though private, operates as a nonprofit educational corporation. Thus, the concern that a private enterprise will be profiting through eminent domain is not present. Rather, the purpose of the Project is unquestionably to promote education and academic research while providing

public benefits to the local community. Indeed, the advancement of higher education is the quintessential example of a "civic purpose" (*see Cornell Univ. v Bagnardi*, 68 NY2d 583, 593 [1986] [recognizing that schools, both public and private, "serve the public's welfare and morals"]). It is fundamental that education and the expansion of knowledge are pivotal government interests. The indisputably public purpose of education is particularly vital for New York City and the State to maintain their respective statuses as global centers of higher education and academic research. To that end, the Project plan includes the construction of facilities dedicated to research and the expansion of laboratories, libraries and student housing.

In addition to these new educational facilities, the Project will bestow numerous other significant civic benefits to the public. For example, the Project calls for the development of approximately two acres of gateless, publicly accessible park-like and landscaped space as well as an open-air market zone along 12th Avenue. Other civic benefits include upgrades in transit infrastructure and a financial commitment to West Harlem Piers Park. Moreover, this Project is projected to stimulate job growth in the local area. In addition to hiring 14,000 people for construction at the Project site, Columbia estimates that it will accommodate 6,000 permanent employees once the Project is completed. In sum, there can be no doubt that the Project approved by ESDC—which provides for the expansion of Columbia's educational facilities and countless public benefits to the surrounding neighborhood, including cultural, recreational and job development benefits—qualifies as a "civic project" under the UDC Act.[9]

## VII.

█ Petitioners finally contend that they were denied procedural due process when ESDC both failed to turn over certain documents during the administrative process pursuant to their FOIL request and closed the record prior to completion of the FOIL litigation. Because ESDC did not withhold any documents

---

**9.** Since the constitutionality of the UDC Act pertaining to "civic projects" is not challenged by petitioners, we respectfully disagree with our concurring colleague that it should be addressed here. Moreover, we do not believe that anything in our opinion could reasonably be construed to mean that "private tennis camps or karate schools" or "private casinos or adult video stores" would qualify as a "civic project" within the meaning of the UDC Act (*see* concurring op at 263).

that formed part of the administrative record and because petitioners are not entitled to discovery under article 2 of the EDPL, we, too, reject this argument as lacking merit.[10]

It is well settled that procedural due process in the context of an agency determination requires that the agency provide an opportunity to be heard in a meaningful manner at a meaningful time (*see Mathews v Eldridge*, 424 US 319, 333 [1976]). In this case, petitioners had an opportunity to comment on the proposed Project in a meaningful manner—both orally and through written submissions—and at a meaningful time—well before ESDC issued its findings and determination to acquire petitioners' property by eminent domain.

It should be emphasized that prior to the ESDC determination, petitioners had unfettered access to over 8,000 pages of documents including, most significantly, the GPP (as initially adopted by ESDC), the FEIS, and the AKRF and Earth Tech neighborhood conditions studies. All of these documents were available to the public during the comment period pursuant to EDPL 203. Indeed, petitioners' substantial opportunity to be heard is reflected in their extensive written submissions after the completion of the two-day public hearing. As a result, ESDC

---

**10.** The procedural due process protections contained within the EDPL include the right to a public hearing and adequate notice of that hearing. With respect to notice, EDPL 202 (A) provides:

> "Where a public hearing is required by this article the condemnor shall give notice to the public of the purpose, time and location of its hearing setting forth the proposed location of the public project including any proposed alternate locations, at least ten but no more than thirty days prior to such public hearing by causing such notice to be published in at least five successive issues of an official daily newspaper if there is one designated in the locality where the project will be situated and in at least five successive issues of a daily newspaper of general circulation in such locality. If the official newspaper is one of general circulation in such locality, publication therein as specified shall be deemed sufficient compliance."

The scope of the public hearing required under the EDPL is addressed in section 203 of the statute. It states, in pertinent part:

> "At the public hearing the condemnor shall outline the purpose, proposed location or alternate locations of the public project and any other information it considers pertinent, including maps and property descriptions of the property to be acquired and adjacent parcels. Thereafter, any person in attendance shall be given a *reasonable opportunity to present an oral or written statement and to submit other documents concerning the proposed public project*. A record of the hearing shall be kept, including written statements submitted" (emphasis added).

prepared 75 pages of detailed responses to petitioners' comments and duly considered their submissions before rendering its final findings and determination (*see Village Auto Body Works v Incorporated Vil. of Westbury*, 90 AD2d 502, 503 [2d Dept 1982] [where a party has an opportunity to raise claims at a public hearing, there is no denial of procedural or substantive due process]).

It is true that, in the separate FOIL proceedings that were litigated during and after this administrative process, we ultimately ruled in favor of petitioner TIA and ordered ESDC to turn over five additional documents related to ESDC's July 2004 agreement with Columbia (*see Matter of West Harlem Bus. Group*, 13 NY3d at 886). However, even if petitioners were legally entitled to the documents under FOIL at the time of the public hearing, a FOIL violation does not establish a due process violation. Indeed, the due process protections embodied in the EDPL do not even allow for discovery.[11] Rather, in enacting the EDPL, the Legislature clearly evinced an intent for expeditious review of agency determinations, not a trial-like hearing process, by placing, for example, original jurisdiction of these proceedings in the Appellate Division and setting a short statute of limitations (*see Matter of Jackson*, 67 NY2d at 424).[12]

To establish that a FOIL violation rose to the level of a due process violation, petitioners "must show that the withholding of the [documents] . . . caused [them] prejudice" (*Adams v United States*, 673 F Supp 1249, 1260 [SD NY 1987]). Here, petitioners have not met their burden, neither explaining how they were deprived of a meaningful opportunity to be heard during the administrative process nor demonstrating the materiality of the records sought through FOIL.

Moreover, "petitioners fail to explain why they failed to bring a motion to vacate the automatic stay" pursuant to CPLR 5519 (c)

---

11. *See supra* at 260 n 10.

12. Prior to enactment of the EDPL, a Commission established to evaluate our State's eminent domain law and procedures recognized the balance between judicial review and the "deleterious effects of prolonged litigation" (*Matter of Goldstein*, 13 NY3d at 534 [Read, J., concurring]). The Commission specifically noted:

"Nor should the construction of public projects be brought to a standstill, as the need for public projects in an advanced urban society is essential. In addition to the problem of a legal blockage of a project, is the fact that the resort to the courts for a review of a project's possible adverse effects results in a lengthy period of delay before ultimate [disposition]" (*id.*, quoting 1971 Rep of State Commn on Eminent Domain, Feb. 1, 1972, at 16).

following the Appellate Division order in their favor that granted their FOIL requests (72 AD3d at 35 [Tom, J., dissenting]). Indeed, the dissenting Justices at the Appellate Division below recognized that

> "[a] CPLR 5519 (c) application would have afforded the Court with the opportunity to assess whether petitioners could demonstrate the likelihood of success on the merits . . . and that such documents were material to ESDC's determination and, thus, essential to affording petitioners procedural due process" (*id.*).

We thus reject petitioners' assertion that they were denied procedural due process.

In sum, we give deference to the findings and determination of the ESDC that the Project qualifies as both a land use improvement project and as a civic project serving a public purpose under the UDC Act. We further conclude that petitioners were not deprived of procedural due process.

Accordingly, the order of the Appellate Division should be reversed, with costs, and the petitions should be dismissed.

SMITH, J. (concurring). I concur in the result on constraint of *Matter of Goldstein v New York State Urban Dev. Corp.* (13 NY3d 511 [2009]). The finding of "blight" in this case seems to me strained and pretextual, but it is no more so than the comparable finding in *Goldstein.* Accepting *Goldstein* as I must, I agree in substance with all but section VI of the majority opinion.

Section VI is unnecessary to the result we reach. Once we have decided that the removal of urban blight provides a sufficient constitutional basis for the taking, and that the project is a "land use improvement project" within the meaning of the Urban Development Corporation (UDC) Act (L 1968, ch 174, § 1, as amended), there is no reason to consider UDC's alternative argument that the taking may also be justified as one for a "civic project." The majority gratuitously decides to reach this question—and then confuses matters by addressing only the statutory, not the constitutional, aspect of Empire State Development Corporation's alternative argument.

The "civic project" issue would be significant in this case only if we rejected the idea that blight removal justifies the taking. But if we did reject the blight rationale, we would have to consider whether this taking can be characterized as being for "public use" on some other ground—an issue the majority does

not discuss. Rather, the majority discusses the statutory definition of "civic project" in a vacuum, as though there were no possible constitutional limitation on the breadth of that term. When we interpret a statute, we should at least consider whether the interpretation we adopt raises constitutional problems.

The statutory definition of "civic project" is "[a] project or that portion of a multi-purpose project designed and intended for the purpose of providing facilities for educational, cultural, recreational, community, municipal, public service or other civic purposes" (McKinney's Uncons Laws of NY § 6253 [6] [d] [UDC Act § 3 (6) (d)]). The majority seems to read this definition as broadly as its literal language permits. It implies that any public or private activity that can fairly be called educational—or, by implication, cultural or recreational and so forth—will qualify a project as "civic." Surely this approach will, in some imaginable cases, cause the statute to be unconstitutional as applied: would anyone seriously suggest, for example, that private tennis camps or karate schools ("educational" uses), or private casinos or adult video stores ("recreational" uses), qualify as "public" uses in the constitutional sense?

It is clear to me that attention to constitutional constraints would require a narrower reading of the term "civic project" than the one the majority adopts. Since the majority pays no attention to those constraints, I do not join section VI of its opinion.

Chief Judge LIPPMAN and Judges GRAFFEO, READ, PIGOTT and JONES concur with Judge CIPARICK; Judge SMITH concurs in result in a separate opinion.

Order reversed, etc.